JACKSON, ADMR., Appellant,

v.

BUTLER COUNTY BOARD OF COUNTY COMMISSIONERS et al., Appellees.

[Cite as *Jackson v. Butler Cty. Bd. of Cty. Commrs.* (1991), 76 Ohio App.3d 448.]

Court of Appeals of Ohio,
Butler County.

No. CA91–01–005.

Decided Dec. 2, 1991.

*Carl D. Ferris; Honohan, Harwood, Chernett & Wasserman* and *Michael W. Fine,* for appellant.

*John F. Holcomb,* Butler County Prosecuting Attorney, *Victoria Daiker* and *Mary Anne Nardiello,* Assistant Prosecuting Attorneys, for appellees Butler County Board of Commissioners, Butler County Department of Human Services, Diane Logsdon and Cathy Shackelford.

*Dinsmore & Shohl, Gary D. Bullock* and *Rita A. Miller,* for appellee James R. Degener.

JONES, Presiding Judge.

On October 27, 1989, plaintiff-appellant, Sherrie Jackson, administrator of the estate of Tiffany Hubbard, filed a wrongful death action in the Butler County Court of Common Pleas. The following parties, all appellees herein, were named as defendants: the Butler County Board of County Commissioners ("commissioners"); the Butler County Department of Human Services ("BCDHS"); BCDHS Director Diane Logsdon; James Degener, a BCDHS caseworker; and Cathy Shackelford, Degener's supervisor. The complaint alleged that appellant's three-year-old daughter, Tiffany Hubbard, died as a result of injuries received from repeated beatings administered by her father, Jeffery Hubbard. The complaint further alleged that the negligent, willful, wanton and reckless misconduct of appellees in placing Tiffany in the custody of Hubbard and their failure to provide protective supervision for the child following the placement proximately caused or substantially contributed to the child's wrongful death.

This case had its origins on March 21, 1986, when Tiffany and her two younger brothers, Jeremy and Joshua, were removed from appellant's custody after authorities investigated appellant's home and found animal and human

feces throughout the house, found Tiffany dressed only in her underwear while the two younger children had no clothes or diapers on. In addition, one of the boys suffered from deep scratches and bruises. By order of the Butler County Court of Common Pleas, Juvenile Division, the children were found to be neglected, temporary custody was granted to BCDHS, and the children were placed in a foster home. At the time, appellant was living with one Kenny Roberts, who had recently been released from prison. Although appellant and Hubbard had never been married, Hubbard had been determined to be the father of Tiffany and Jeremy in an earlier paternity proceeding. Hubbard was living with a Delores Nieman, who was herself the mother of two young children by Hubbard.

Following the children's placement in foster care, BCDHS formulated reunification plans for the purpose of reuniting the children with their parents. The plans were drafted by Degener and reviewed by Shackelford. These plans were heard, modified and approved by the juvenile court in separate proceedings on May 9, 1986 and July 29, 1986. At the July 29, 1986 hearing, the juvenile court directed that the Hubbard home be investigated as a possible foster home, since Hubbard and Nieman had done substantially everything required under the initial plan. On the other hand, appellant had demonstrated virtually no progress in complying with the reunification plan. The juvenile court set another hearing for September 3, 1986.

The case of the Hubbard children was discussed at an August 4, 1986 BCDHS staff meeting. Because of the juvenile court's expressed intention to grant custody of Tiffany and Jeremy to Hubbard, it was decided that the children would be placed with Hubbard and Nieman until the September 3, 1986 hearing so that BCDHS could have a basis for making a permanent custody recommendation to the court at that time. Pursuant to its authority to order temporary placements for up to sixty days, BCDHS placed Tiffany and Jeremy in the Hubbard home on August 6, 1986.

At the September 3, 1986 hearing, BCDHS advised the juvenile court that the placement of Tiffany and Jeremy in the Hubbard home appeared to be satisfactory. At the conclusion of the hearing, the juvenile court terminated BCDHS's custody of Tiffany and Jeremy and, over appellant's objection, placed them in Hubbard's temporary custody. The court also ordered BCDHS to continue appellant's visitation arrangements and maintain its protective supervision of the children's placement.

Following this hearing, Degener visited the Hubbard home on at least one occasion and had four telephone calls with Nieman during which they discussed the health and welfare of the children. Nieman told Degener that Tiffany had influenza and that she and Tiffany kept contracting the disease

from each other. Degener and Nieman discussed the possibility of taking Tiffany to the doctor, and he followed up with additional calls inquiring as to Tiffany's health. On September 23, 1986, Degener called Nieman to arrange for a visitation. At this point, Degener had not seen Tiffany since August 11, 1986.

On September 30, 1986, Tiffany was found dead in the Hubbard home. Her death was attributed to beatings administered by Hubbard, who subsequently was convicted of involuntary manslaughter.

Appellees filed motions for summary judgment, claiming they were immune from liability under the provisions of R.C. Chapter 2744. In a comprehensive and well-written opinion, the trial court found that reasonable minds could come to but one conclusion which was adverse to appellant and that appellees were entitled to judgment as a matter of law. The trial granted summary judgment to all appellees. On appeal, appellant submits the following as her sole assignment of error:

"The court erred in granting appellees' motion for summary judgment in light of the requirements of Rule 56(C) of the Ohio Rules of Civil Procedure, since genuine issues of material fact exist in the instant case, appellees were not entitled to judgment as a matter of law, and reasonable minds could come to a conclusion in favor of the appellant construing the evidence most strongly in appellant's favor."

Appellant submits that summary judgment is inappropriate in the case at bar since appellees are not entitled to immunity under R.C. Chapter 2744 as a matter of law and a genuine issue of material fact exists with respect to whether appellees are liable for the death of Tiffany Hubbard. Pursuant to Civ.R. 56(C), summary judgment will be granted where (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion and, viewing the evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to the nonmoving party. *Albain v. Flower Hosp.* (1990), 50 Ohio St.3d 251, 254, 553 N.E.2d 1038, 1042. See, also, *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274. Within the context of the case at bar, the key issue to be considered is whether appellees were entitled to judgment as a matter of law as a result of the immunity granted under R.C. Chapter 2744.

In response to numerous Supreme Court decisions abrogating the common-law doctrine of sovereign immunity, the General Assembly enacted R.C. Chapter 2744 to restore the defense of sovereign immunity to political subdivisions. See, *e.g.*, *McVetta v. Totin* (1990), 56 Ohio App.3d 87, 88, 564

N.E.2d 1143, 1144, and cases cited therein. Generally, a political subdivision and its employees are not liable for damages in a civil action for death caused by an act or omission of the political subdivision or any of its employees in connection with the exercise of a governmental or proprietary function. R.C. 2744.02(A)(1). For purposes of R.C. Chapter 2744, a county is a political subdivision, R.C. 2744.01(F), and the operation of a county human services department is a governmental function. R.C. 2744.01(C)(2)(m). In addition, Shackelford, Logsdon, and Degener are employees of a political subdivision. R.C. 2744.01(B).

■ The political subdivision itself is immune from liability if the death or injury resulted from the exercise of judgment or discretion in determining how to use personnel and other resources, unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner. R.C. 2744.03(A)(5). Similarly, R.C. 2744.03(A)(6) provides that:

"In addition to any immunity or defense * * * the employee is immune from liability unless one of the following applies:

"(a) His acts or omissions were manifestly outside the scope of his employment or official responsibilities;

"(b) His acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

"(c) Liability is expressly imposed upon the employee by a section of the Revised Code."

With respect to the individual employees, R.C. 2744.03(A)(6)(a) is inapplicable to the case at bar. The complaint acknowledges that the individual employees were acting within the scope of their employment. Furthermore, Logsdon, Shackelford, and Degener were also acting under the auspices, direction, and order of the juvenile court. In addition, appellant does not cite any section of the Revised Code which would impose liability on the employees under R.C. 2744.03(A)(6)(c). Thus, the question is whether a genuine issue of fact exists with respect to the employees' conduct, and whether the way in which they handled Tiffany Hubbard's case reflects malicious purpose, bad faith, or a wanton or reckless manner on their part. R.C. 2744.03(A)(6)(b).

■ As to whether conduct would reflect a malicious purpose, the Supreme Court has held that " '[m]alicious' means 'indulging or exercising malice; harboring ill will or enmity.' " *Teramano v. Teramano* (1966), 6 Ohio St.2d 117, 118, 35 O.O.2d 144, 145, 216 N.E.2d 375, 377. Furthermore, "malice" can be defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct which is unlawful

or unjustified. See *Bush v. Kelley's, Inc.* (1969), 18 Ohio St.2d 89, 47 O.O.2d 238, 247 N.E.2d 745.

█ With respect to "bad faith," the second standard enumerated in R.C. 2744.03(A)(6)(b), the Supreme Court, in *Slater v. Motorists Mut. Ins. Co.* (1962), 174 Ohio St. 148, 21 O.O.2d 420, 187 N.E.2d 45, paragraph two of the syllabus, held that:

" * * * [B]ad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another."

Finally, an individual acts in a "reckless" manner " 'if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.' " *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 104–105, 559 N.E.2d 705, 708, quoting 2 Restatement of the Law 2d, Torts (1965), at 587, Section 500.

The Supreme Court also noted that since the term "reckless" is often used interchangeably with "willful" and "wanton," its comments regarding recklessness apply equally to conduct characterized as willful or wanton. *Id.* at 104, 559 N.E.2d at 708, fn. 1. Furthermore, we recently held that the term "reckless" as used in R.C. 2744.03(A)(6)(b) means a perverse disregard of a known risk. *Poe v. Hamilton* (1990), 56 Ohio App.3d 137, 138, 565 N.E.2d 887, 889. We also concluded that "[i]n R.C. 2744.03(A)(6)(b), the word 'reckless' is associated with the words 'malicious purpose,' 'bad faith,' and 'wanton,' all of which suggest conduct more egregious than simple carelessness." *Id.*

█ Applying these standards to the case at bar, we must first determine whether the conduct of Degener, Shackelford, and Logsdon in supervising Tiffany's placement in the Hubbard home suggests conduct more egregious than simple carelessness, or reflects the perverse disregard of a known risk. Appellant relies on the following evidence in support of her position that appellees were reckless: a written evaluation prepared by the Children's Diagnostic Center ("CDC"), the alleged failure of BCDHS to adequately supervise Tiffany's placement in the Hubbard home, and an expert witness'

affidavit indicating that appellees were "reckless" in placing Tiffany in the Hubbard home.[1]

Appellant argues that the CDC report is replete with warnings that it would be dangerous to place Tiffany in the custody of her father. The report excludes appellant as a prospective custodian, and while not portraying Jeffery Hubbard as the ideal parent, it does conclude that Hubbard and Nieman could benefit from marital therapy if considered as custodians of Tiffany and her brothers. The report does not even contemplate the actions of Hubbard as they were finally acted out. The report is void of any suggestion of violence and, at its most critical point, simply states that if Hubbard's "depression proceeds from the mild to moderate level which it normally exists at, to a more severe level, [he] can be expected to either act out illegally or to become involved in substance abuse." Although the report classifies Hubbard in less than idealistic terms, we agree with the trial court's well-founded observation that cases such as the one currently under consideration deal "with less than an ideal environment [and] extremely disadvantaged people."

As to the claim that BCDHS failed to adequately supervise the placement once Tiffany was in the Hubbard home, appellant argues that Degener's failure to see Tiffany on a face-to-face basis reflects a "reckless" attitude and failure to adequately supervise the placement since there was evidence that Tiffany's injuries were inflicted weeks before her death. Although Degener did not see Tiffany between September 3, 1986 and the date of her death, he did stop at the Hubbard home on one occasion and called there several other times. Among other things, Degener discovered that both Tiffany and Nieman were suffering from influenza. Degener gave Nieman authority to seek medical help for herself and Tiffany. At the time of the home visit, Degener did not see Hubbard and believed he was working. Although Degener did not confirm Hubbard's employment, such lack of confirmation certainly does not rise to the level of recklessness. We again agree with the trial court's observation that "[a] social homeworker cannot be everywhere at all times and everything to everybody. * * * The fact that Tiffany died and that it could have been prevented with more vigilance on behalf of [BCDHS] does not equate with negligence, let alone recklessness. The department is not an insurer of its clients."

---

**1.** The trial court declared this affidavit inadmissible for a number of reasons and refused to consider it. See Civ.R. 56(E). Appellant has not specifically assigned the court's refusal to admit the affidavit as error, but simply refers to the affidavit as supporting evidence in her brief. In the absence of an assigned error, we will not consider whether the trial court properly declared the affidavit inadmissible or whether such creates a genuine issue of fact. App.R. 12(A).

 Appellant also claims that the commissioners bear a responsibility for Tiffany's death inasmuch as they did not adequately finance or fund BCDHS. In support of this position, appellant relies on a letter written by Degener in which he claimed to be overburdened by a heavy caseload and that there was a need for additional social workers. Following Tiffany's death, Logsdon made a request for additional personnel and the commissioners agreed to fund three additional home social workers. Appellant asserts that "in all probability" the addition of these workers would have given Degener time to see Tiffany and her father face-to-face, which in turn would have saved Tiffany's life.

Such is pure speculation and it is impossible to know how many additional caseworkers, if any, might have accomplished this purpose. Furthermore, the funding of additional workers was a discretionary matter with the commissioners. If the commissioners could be held liable for the unfortunate consequences suffered by each BCDHS client wherein the expenditure of additional money and personnel might have prevented it, then the commissioners are indeed insurers of the welfare of all who utilize the services offered by BCDHS. It cannot be said, however, that the commissioners' exercise of judgment or discretion with respect to the use of personnel and other resources was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.

In conclusion, we find that, after construing the evidence most strongly in favor of appellant, reasonable minds could come to but one conclusion, being that appellees' conduct in handling Tiffany Hubbard's case neither amounted to a perverse disregard of a known risk nor rose to the level of maliciousness, bad faith, or recklessness. Accordingly, appellees are entitled to the statutory immunity established by R.C. Chapter 2744 and are also entitled to judgment as a matter of law. Appellant's assignment of error is not well taken and is hereby overruled.

*Judgment affirmed.*

KOEHLER, J., concurs.

WALSH, J., dissents.

WALSH, Judge, dissenting.

I respectfully dissent from the majority's decision because I cannot accept the conclusion that reasonable minds could not differ that the actions and inactions of James Degener, the BCDHS social worker, with respect to the supervision of Tiffany Hubbard's placement, did not amount to recklessness.

In companion cases decided last year, *Marchetti v. Kalish* (1990), 53 Ohio St.3d 95, 559 N.E.2d 699, and *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 559 N.E.2d 705, the Ohio Supreme Court adopted the definition of "recklessness" as set forth in the 2 Restatement of the Law 2d, Torts. As the majority correctly points out, the Supreme Court cites 2 Restatement of the Law 2d, Torts (1965), at 587, Section 500, to define the term as follows:

" 'The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.' " *Thompson, supra,* at 104–105, 559 N.E.2d at 708. See *Marchetti, supra,* 53 Ohio St.3d at 96, 559 N.E.2d at 700, fn. 2.

Unlike the majority, however, after applying this definition to the facts in the case at hand, I would find reasonable minds could differ on whether Degener's failure to adequately supervise Tiffany's placement was so unreasonably dangerous that he knew or should have known it was highly probable harm would result to Tiffany.

The majority concludes the trial court properly granted summary judgment on appellant's inadequate-supervision claim in favor of Degener on the basis that (1) Degener stopped at the Hubbard home once and called several times after the placement, and (2) Degener gave Nieman authorization to seek medical attention for herself and Tiffany. The majority also declares that Degener's failure to confirm Hubbard's employment does not amount to recklessness. Upon a review of all the evidentiary material, I believe the majority's finding ignores Degener's experience, training and knowledge of the unique circumstances which led up to and surrounded Tiffany's placement into the Hubbard home.

At his deposition, Degener testified he had "some reservations" as to placing the children with Hubbard and Nieman given Nieman's relatively young age (she was seventeen at the time) and a Children's Diagnostic Center evaluation of both Hubbard and Nieman. A reading of the CDC evaluation, which was undertaken to assess Hubbard's and Nieman's ability to parent the children, bears out Degener's apprehension. The evaluation portrays Hubbard as an immature, inadequate and borderline mentally retarded man who has been on welfare since he dropped out of school in the eleventh grade. Contrary to the conclusion reached by the majority, the evaluation amply warns of Hubbard's penchant for belligerent and malevolent behavior. According to the evaluation, Hubbard suffers from a passive-aggressive expres-

sion of anger that, in the opinion of a clinical psychologist, directly affects Hubbard's ability to parent children. The evaluation also states that the disorder stems from Hubbard's upbringing in a dysfunctional family filled with conflict and abuse. The evaluation concludes by noting that neither Hubbard nor Nieman has the necessary maturity and cooperation to make a "blended" family succeed.

Degener's reservations about the placement must have been persuasive to him because they prompted him to make a recommendation to the trial court which was eventually implemented. In an addendum to a social summary prepared for the court, Degener recommended that Hubbard receive custody of the children subject to "protective services" by BCDHS. At his deposition, Degener testified that the purpose of the "protective services" recommendation was to "keep in touch with the family, to arrange the visits, and *to make certain that things were going well."* (Emphasis added.) R.C. 5101.46(F)(3) defines "protective services" as "services for the prevention or remedying of the neglect, abuse, or exploitation of children * * * who are unable to protect their own interests." Based on the recommendation, the court ordered BCDHS to maintain protective supervision over the placement for sixty days. "Protective supervision" is defined by R.C. 2151.011(B)(16) as:

"[A]n order of disposition pursuant to which the court permits an abused, neglected, dependent * * * child * * * to remain in the custody of his parents, guardian, or custodian and stay in his home, subject to any conditions and limitations upon the child, his parents, guardian, or custodian, * * * including supervision as directed by the court for the protection of the child."

Despite taking a precautionary measure to not only alleviate his doubts about the placement, but to ensure the placement into the Hubbard home went properly, Degener last saw Tiffany on August 11, 1986, a full month and a half before the child's death. Degener also canceled two home visits to the Hubbard home during the same time interval. Admittedly, Degener did inquire into the health of the children and authorize medical assistance for Tiffany in the period following the placement.

However, the record also reflects Nieman told Degener on September 11, 1986 that Tiffany had the flu and that twelve days later, on September 23, 1986, Nieman again notified Degener that Tiffany still suffered from listlessness and "just lays [*sic*] around." In a phone conversation that same day, Nieman told Degener she planned to take Tiffany back to the doctor the next day. Although being informed that Tiffany was suffering from the flu, Degener did not personally check on the child's condition during a visit to the Hubbard home while Tiffany allegedly had the ailment, nor did he confirm whether Nieman had actually taken the child to a doctor. Also, what else

would Nieman have said if she were trying to conceal the abuse being committed on Tiffany? In short, Degener fell short in providing the necessary "protective services" to prevent the abuse of a three-year-old child unable to protect her own interest.

It is well settled that the granting of summary judgment terminates a litigant's right to a trial and precludes the jury's consideration of a case. See *Shaw v. Central Oil Asphalt Corp.* (1981), 5 Ohio App.3d 42, 5 OBR 45, 449 N.E.2d 3. Consequently, summary judgment should be used cautiously and sparingly, and granted only when it appears from the evidentiary material, after resolving all doubts and construing the evidence against the moving party, that reasonable minds can reach only an adverse conclusion as to the party opposing the motion. *Vetovitz Bros., Inc. v. Kenny Constr. Co.* (1978), 60 Ohio App.2d 331, 14 O.O.3d 292, 397 N.E.2d 412. Although often repeated, it bears mentioning once again: the purpose of summary judgment is to determine whether triable issues of fact exist, not to try issues of fact. See *Viock v. Stowe–Woodward Co.* (1983), 13 Ohio App.3d 7, 13 OBR 8, 467 N.E.2d 1378.

Construing the evidence before the trial court in a light most favorable to appellant, I believe reasonable minds could differ as to whether the facts, of which Degener had reason to know, should have led him to the belief that his failure to observe Tiffany during this period permitted an unreasonable and substantial risk of physical harm to Tiffany.

As a practical matter, it is more difficult to identify whether a jury question exists based upon a person's inactions than upon the person's actions. To answer the question in this case, we must look to all of the facts and circumstances known to Degener at the time and measure that knowledge against his training, experience and education.

Degener was a man of some experience as a social worker. He had worked for almost two years as a social worker for BCDHS, received a master's degree in social work from the University of North Carolina, and was trained to detect signs of child abuse and neglect. It was this experience, education and training which prompted him not only to express doubt as to the placement, but to recommend a period of "protective services" based, in part, on his knowledge of Hubbard's abuse-filled childhood and the negative effect that Hubbard's anger displacement disorder had on Hubbard's ability to care for children. These doubts, in addition to the unusual circumstances surrounding the placement, should have alerted Degener to be aware of any questionable or suspicious behavior at the Hubbard home. The fact Degener was informed by Nieman that Tiffany had an abnormally long illness, conduct which a trained social worker could arguably consider to be a crude attempt to

"cover-up" visual effects of child abuse, particularly in light of the fact the social worker had not seen the child for over a month, and that Degener did not check on Tiffany when he visited the house while the child was supposedly ill or verify that Tiffany had been taken to a doctor as Nieman implied, could lead reasonable minds to differ on whether Degener's actions ignored unreasonably dangerous circumstances that he should have known would probably result in harm to Tiffany.

The autopsy of the coroner revealed that several of the bruises inflicted on Tiffany by Hubbard, some of which were fourteen to thirty days old at the time of the child's death, were visible on the child's legs, arms, face and neck. Had Degener seen Tiffany while at the Hubbard home or, at the very least, been assured by a source other than Nieman that Tiffany had been examined by a doctor, a strong probability exists that the bruises would have been detected and Hubbard's behavior exposed. In light of these circumstances, it is my opinion that a jury question is presented as to whether Degener's omissions, which failed to protect Tiffany, rose to the level of recklessness sufficient to impose liability under R.C. 2744.03(A)(6)(b).