OPINION
Defendant-Appellant, Mary Jane Thomas ("Thomas"), appeals the trial court's denial of her motion for summary judgment. Thomas, mayor of the village of New Paris, moved for summary judgment on the basis of immunity in a claim filed against her by a member of the village police department. We affirm.
Plaintiff-appellee, Willard Floyd ("Floyd"), was employed as a sergeant for the New Paris Police Department. In July 1996, Floyd was classified as the head of the police department. The department did not have a chief of police or marshal at the time, and so as the highest-ranking police officer, Floyd was placed in charge of the daily operations of the police department.
In late October 1996, Floyd received an anonymous message on the police department answering machine. The caller stated "you better check the councilman, he has a record." Based on his police training, Floyd believed that it was a crime for a person with a felony record to hold an office of public trust. He had a suspicion that the caller may be referring to council member Glenn Brown because during a conversation with Floyd, Brown stated that he had "served his time for mistakes." Floyd also considered Darrin Turner, a candidate for council, because he knew from a previous case that Turner had some type of criminal record, but Floyd could not remember the specifics.
The village of New Paris has access to the Law Enforcement Automated Data System (LEADS) and officers receive training in the use of the system. Police are able to use LEADS to conduct background information checks on persons under criminal investigation. Floyd instructed another village policeman, Darrin Kirkpatrick, to conduct a LEADS background check on both Brown and Turner.
When the results of the LEADS check indicated that Brown had a felony conviction, Floyd contacted Rebecca Ferguson, the Preble County Prosecutor. He informed Ferguson that he had received an anonymous phone call, which caused him to conduct a LEADS check. Floyd stated that based on the information he received from LEADS, he believed Brown had a felony conviction in another state. Floyd requested Ferguson's advice on how to proceed. Ferguson advised Floyd to verify that that the conviction was for a felony and to take the information to the council safety committee.
Floyd met with the head of the safety committee, Jeff Kyle, and informed him of the investigation. Floyd stated that the information still needed to be verified and that he was continuing to investigate. Floyd and Jeff Kyle discussed the investigation with Charlene Captain, the other member of the council safety committee. During the meeting the safety committee discussed performing LEADS checks on all persons the public might consider to be a member of council in order to do a thorough investigation and so that it would not appear Brown was targeted. Floyd performed LEADS checks on the mayor, council members, and two village clerks. At the same time he also performed a LEADS check on Donald Parker, who he was investigating in another matter and who Floyd believed had written Brown's letter of intent to run for council. After receiving confirmation from another state regarding Brown's conviction, Floyd met again with the safety committee. The two council members then informed Thomas of the investigation.
At a council meeting the following night, the council held an executive session to discuss the information discovered by Floyd. Shortly after the meeting, several council members told Floyd that he had better "watch out." Floyd was concerned that Thomas might try to retaliate against him. He had not informed her of the investigation when it began because she and Brown were good friends. A few days later, Steven Hobbs, the village solicitor, told Floyd that he thought the background search on Brown was illegal. Hobbs stated that he thought Brown's conviction was only a misdemeanor, and not a felony as the evidence Floyd obtained indicated.
Thomas filed a complaint with LEADS and asked for an investigation regarding misuse of the system by Floyd in his investigation of Brown. The Preble County Sheriff's Department conducted an investigation of theft of computer data. The evidence was presented to a grand jury which refused to indict Floyd. Thomas continued to pursue the matter with LEADS, who responded in a letter stating LEADS felt that there was sufficient evidence to determine that a violation of policy had occurred and the village was placed on Level Two sanction. Thomas discussed the letter and possible action to be taken against Floyd and the two had a heated exchange of words. Floyd was upset that no action had been taken as a result of the information discovered on Brown's conviction and that instead, they were discussing action against him for performing his job.
Thomas later told Floyd he was on "indefinite suspension, inactive reserve" and took Floyd's office keys. Thomas did not mention whether or not Floyd would be paid. During an August council meeting, Floyd was given an unsigned, undated, blank form that had a general statement that there were charges against him for misuse of LEADS. Floyd also testified that during the meeting, Hobbs threatened him by stating, "Sir, we will get you." During the meeting, council voted to change the suspension to a paid administrative leave.
According to Floyd, within a few days of his suspension, there was an article about the suspension in a newspaper, the Palladium Item. The article stated that Floyd was removed from his position "for the safety and welfare of the people of New Paris."
Thomas served formal charges on Floyd and the charges were discussed by council in November 1997. The charges stated that Floyd was guilty of "incompetency, inefficiency, dishonesty, neglect of duty, and other acts of misfeasance, malfeasance, or nonfeasance in the performance of his official duty." The charges also stated that Floyd had committed "unauthorized use of property, in violation of R.C. 2913.04(B), a felony of the fifth degree." Floyd testified about the investigation during the meeting. At the conclusion of the meeting, council reinstated him to his previous job duties and rate of compensation. Floyd testified that although he was supposed to return to work as before the suspension, Thomas has not returned the keys to his former office.
After Floyd was reinstated, Thomas wrote another letter to LEADS regarding Floyd. The letter stated that council had been "told by three law enforcement officers the night of the hearing, prior to that hearing by the village attorney that this was a crime and they completely over looked [sic] the facts that was [sic] told to them before and during the hearing." Thomas requested that the LEADS steering committee "hit them hard with a very severe penalty, other wise [sic] they will still play games." As a result of the letter, LEADS cancelled its service to the village of New Paris.
Thomas admits that she contacted LEADS and pursued what she felt was improper use of the system, but that she only acted on the advice of the city solicitor. She testified that from her point of view, Floyd was not suspended or terminated but was just "off the schedule." Thomas testified that she made statements to the media, including a statement to the Palladium Item. She also admitted filing charges after the grand jury refused to indict, but stated that the charges were written by the city solicitor. Floyd contends that Thomas conspired with the village solicitor to use this situation to try to have him fired from his job as a police officer.
Floyd filed a complaint against Thomas, Hobbs, and the village of New Paris for interference with his employment contract, defamation, and intentional infliction of emotional distress. Thomas moved for summary judgment on the basis that she was entitled to immunity pursuant to R.C. 2744.03 and on the basis of absolute or qualified privilege. The trial court denied Thomas' motion by briefly stating that "a genuine issue of material fact exists as to whether Mayor Thomas acted maliciously, thereby triggering the R.C. 2744.03(A)(6)(b) exception to immunity."
Thomas appeals the trial court's denial of her motion for summary judgment and raises the following assignment of error:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN DENYING HER MOTION FOR SUMMARY JUDGMENT.
 Our standard of review on summary judgment is de novo. Jones v. Shelly Co. (1995), 106 Ohio App.3d 440. Summary judgment is appropriate pursuant to Civ.R. 56(C) when (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) construing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to only one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 66. Summary judgment is a procedural device to terminate litigation, so it must be granted cautiously with any doubts resolved in favor of the non-moving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356, 358-59.
Thomas first argues that as an employee of the village of New Paris, she is entitled to statutory immunity for tort liability. She also contends that her acts do not fall under the enumerated exceptions to immunity.
Ohio law provides immunity for employees of political subdivisions in R.C. 2744.03(A)(6). This provision provides that an employee is immune from liability unless one of three exceptions apply: (1) the employee's acts were manifestly outside the scope of employment or official responsibilities; (2) the acts were committed with malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) liability is expressly imposed by another section of the Revised Code. R.C. 2744(A)(6)(a)-(c).
Floyd responds that Thomas' actions were outside the scope of her employment because she was not authorized to place him on suspension. R.C. 737.19(B) provides "the marshal of a village has the exclusive right to suspend any of the deputies, officers, or employees in the village police department who are under the management and control of the marshal for incompetence, gross neglect of duty, gross immorality, habitual drunkenness, failure to obey orders given them by the proper authority, or for any other reasonable or just cause." Both Floyd and Thomas testified that during the time of the events related to this case, the village did not have a marshal. Floyd argues that it was beyond Thomas' authority to suspend him since she was not the marshal.
Floyd also argues that Thomas acted with a malicious purpose, in bad faith and in a wanton and reckless manner. Within the context of R.C. 2744.03(A)(6)(3), "malice" refers to a willful and intentional design to do injury. Jackson v. Butler Cty. Bd. ofCty. Commrs. (1991), 76 Ohio App.3d 448, 453. An employee acts in "bad faith" where there is a "dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of the fraud. Id. at 454, quoting Slater v. Motorists Mutual Ins. Co. (1962), 174 Ohio St. 148, paragraph two of the syllabus. "Reckless" refers to an act done with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of harm and that this risk is substantially greater than that necessary to make the conduct negligent.Thompson v. McNeil (1990), 53 Ohio St.3d 102, 104-105.
Floyd testified that he and Thomas have a "rocky" relationship. He indicated that it is probably the result of his refusal to support Donald Parker for police chief when the mayor wanted Parker as chief. He also knew that Thomas and Brown were friends and that he did not inform her of the investigation out of concern she would interfere by telling someone. When the information regarding Brown's conviction was presented to Thomas, she instead investigated whether Floyd had misused LEADS. She continued to pursue the matter, even after Floyd was suspended and reinstated, and after a grand jury and the village council determined no further action should be taken. Floyd alleges that there was a conspiracy between Thomas and Hobbs to have him removed from the police department. Floyd claims that Hobbs threatened him by stating "sir, we will get you."
Viewing the evidence in a light most favorable to Floyd, these facts create a genuine issue of material fact as to whether Thomas' actions fall within the exceptions to statutory immunity. There are factual questions regarding whether Thomas acted within the scope of her authority. There are also factual questions regarding whether Thomas' actions were motivated by malice, ill will or bad faith.
The next arguments advanced by Thomas pertain to the claim of defamation. Thomas' arguments discuss both statutory immunity and common law privileges under defamation law. Thomas argues that statements by government officials on matters of public concern are protected by a qualified privilege and are within the scope of official responsibilities under R.C. 2722.03(A)(6)(a) and that statements during the city council meeting are covered by an absolute privilege.
Thomas alleges that because her public comments were upon matters of public concern, she is immune from liability under R.C.2744.03(A)(6)(a). Although Thomas is correct in her statement that media statements are within the scope of her employment, the exception to immunity found in R.C. 2744.03(A)(6)(3) for acts committed with malicious purpose, in bad faith and in a wanton and reckless manner would still apply. As discussed above, there is sufficient evidence to create a genuine issue of fact with regard to this exception to statutory immunity.
Thomas also argues that because she is a government official, she has a qualified privilege and evidence of actual malice is necessary. A qualified privilege has been recognized in Ohio for public officials who make statements on matters of public concern.Deoma v. Shaker Heights (1990), 68 Ohio App.3d 72, 82-83. This qualified privilege is defeated when a statement is made with actual malice. Jacobs v. Frank (1991), 60 Ohio St.3d 111, 116. Actual malice is defined as "acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." AB-Abell Elevator v. Columbus/Cent. OhioBldg. (1995), 73 Ohio St.3d 1, 11-12. To establish reckless disregard, the evidence must show that the defendant had serious doubts about the truth of the publication. Id. at 12.
The focus is not on the defendant's attitude toward the plaintiff, but on the defendant's attitude towards the truth or falsity of the statement. Condit v. Clermont County Review
(1994), 93 Ohio App.3d 166, 171. The issue of actual malice does not readily lend itself to disposition on summary judgment as it calls into question the defendant's state of mind. Id. at 174. On a motion for summary judgment, the court is limited to examining the evidence and taking all permissible inferences and resolving issues of credibility in the nonmoving party's favor to determine whether a reasonable jury could find actual malice with convincing clarity. Id. at 172.
After careful review of the evidence presented in this case, we find sufficient evidence of actual malice to overcome a motion for summary judgment. Construing the evidence most strongly in Floyd's favor, Thomas accused Floyd of several crimes even after the charges were investigated and not acted on by a grand jury. Thomas also stated in a letter to LEADS that law enforcement officers said that Floyd's actions were a crime. Although the parties argue different interpretations of this letter, we must construe the evidence most strongly in Floyd's favor and a jury could find his interpretation reasonable under these facts. A jury could determine that because Thomas knew that the grand jury did not find Floyd's acts were a crime, she acted in reckless disregard of the truth when she accused Floyd of committing a crime. Making all inferences in favor of Floyd, reasonable minds could differ on whether Thomas acted with actual malice, a question which a jury should be permitted to decide.
Thomas next argues that the formal charges she filed against Floyd are protected by absolute privilege because they were made during a city council meeting. Absolute privilege differs from a qualified privilege in that complete protection is afforded by an absolute privilege, while a qualified privilege affords protection only in the absence of actual malice. Constanzo v. Gaul (1980),62 Ohio St.2d 106, 108-09. Application of an absolute privilege is found only in very limited areas of activity and has been generally limited to legislative and judicial proceedings and other acts of state. Id. at 109.
The Ohio Supreme Court determined that the rule of absolute privilege should be reasonably extended to "utterances made during the course of official proceedings by members of local governing bodies, at least where the statements relate to a matter under consideration, discussion or debate." Id. at 110. However, the absolute privilege "should not be extended to members of city council where there is no pending legislation relating to the subject matter of the alleged defamation and where the publication is beyond the legislative forum." Id. Instead, statements made other than in a legislative session or related meeting should be afforded a qualified privilege. Id. at 110-11. Extension of absolute privilege to local governing bodies has generally been limited to occasions in which the local authority is conducting legislative or judicial proceedings. Marcum v. Rice, July 20, 1999, 1999 Lexis 3365, at *8-14, Franklin App. Nos. 98AP-717, 98AP-718, 98AP-719.
Floyd argues that defamatory statements were made both in and outside of council meetings. Thomas admitted making statements to the media about Floyd's suspension and writing a letter to LEADS stating that Floyd committed a crime. Statements made outside the council meeting do not fall within the protection of absolute privilege.
The circumstances regarding the publication of the formal charges against Floyd are unclear from the record before us. The record shows that the charges were presented at a council meeting, although it is unclear what type of function council was performing at the time. In light of the Ohio Supreme Court's admonition that absolute privilege is to be extended only in a limited number of circumstances, we are hesitant to automatically apply an absolute privilege without specific information regarding the circumstances surrounding the publication of the charges. The particular circumstances surrounding the alleged defamatory statements made in this case should be examined at trial and it should be determined whether any of the statements occurred under circumstances which would qualify under absolute privilege.
Finally, Thomas contends that she is not liable for interference with Floyd's employment contract because she was in a supervisory position over him. An employee cannot maintain an action for tortious interference with an employment contract against the employee's supervisor, even if the supervisor's actions were malicious. Anderson v. Minter (1972), 32 Ohio St.2d 207,213. However, the act complained of must be within the scope of the supervisor's duties. Id. As previously discussed, there are genuine issues of material fact regarding whether Thomas was acting within the scope of her authority in suspending Floyd. Therefore, summary judgment is not appropriate on the claim for interference with an employment relationship.
As there are genuine issues of material fact to be determined, the trial court did not err in overruling Thomas' motion for summary judgment. Accordingly, appellant's assignment of error is overruled.
 ________________ POWELL, P.J.
YOUNG and VALEN, JJ., concur.