OPINION
Plaintiff-appellant, Dennis Weatherby ("Weatherby"), appeals from the November 19, 1998 judgment of the Ohio Court of Claims finding: (1) that the former president of Central State University, Herman B. Smith, and a former faculty member, Dianne Love, were entitled to personal immunity; (2) that defendant-appellee, Central State University ("CSU" or "University") did not defame Weatherby; and (3) that CSU breached its contract with Weatherby, but he was only entitled to damages for the 1996-1997 academic year. For the reasons that follow, we affirm in part and reverse in part.
Weatherby had joined the faculty of the International Center for Water Resources Management ("ICWRM") at CSU in 1989 as an instructor and, in 1994, he was promoted to Assistant Professor and applied for tenure. Weatherby held a regular appointment to the CSU faculty pursuant to a collective bargaining agreement between CSU and the American Association of University Professors ("CSU-AAUP Agreement").
In June 1994, Dianne Love joined the CSU faculty with a regular appointment in the ICWRM. Plaintiff-appellee, Victor Okereke, the ICWRM chairman at the time, and Weatherby believed this was a temporary arrangement as Love did not teach any courses in Water Resources and was supposed to be paid from sources outside the ICWRM. As a result of this arrangement, the ICWRM incurred a deficit of approximately $53,000 for the 1994-1995 academic year which Okereke and Weatherby attributed to the payment of Love's salary from ICWRM funds. Okereke and Weatherby opposed the continuation of this arrangement, and Weatherby voiced his concerns to other faculty members.
In March 1995, the University Board of Trustees appointed Dr. Herman B. Smith president of CSU. In June 1995, Weatherby and Okereke became embroiled in a conflict with Smith over an ICWRM student who wanted to graduate with his class but who had not completed all the requirements for graduation. The student had informed Smith that he needed only one credit to graduate when the student actually needed twenty-seven credits. Okereke and Weatherby were opposed to allowing the student to graduate. Ultimately, the student was allowed to graduate, and Smith expressed great anger over what he perceived as Weatherby's and Okereke's incompetence in handling the situation.
In July 1995, Smith removed Okereke as Director of the ICWRM and replaced him with Love with whom he had previously worked at Jackson State University. Love then took control of Weatherby's student files and would not allow him to copy them. She relocated his first floor office to a smaller windowless office with no telephone. Weatherby did not get a telephone in his new office until October. In September 1995, Weatherby discovered his paycheck was short, and found out that a supplemental contract from which he was paid had been unilaterally terminated.
During this time, Weatherby and Okereke had been negotiating and building positive relationships with administrative personnel from the Ohio EPA. The Ohio EPA planned to provide scholarships to two CSU ICWRM students in the fall of 1995. The Ohio EPA also proposed to donate over a million dollars of used equipment to ICWRM. Love, however, instructed the Ohio EPA to deal only through her, and not through Weatherby. As a result of Love's actions, the Ohio EPA administrators became concerned about the program and did not award any scholarships or donate the used equipment.
Love began a review of ICWRM files. Love believed that Dr. Okereke had improperly approved expenditures from a Packard grant to allow Weatherby to obtain an advance degree. Thereafter, Dr. Smith contacted legal counsel for the purpose of determining how the University could terminate Okereke and Weatherby.
On December 15, 1995, Weatherby was formally charged with "[g]ross negligence in scholarship and University service relative to improper and unallowed utilization of Packard Grant Fund for Professional Development." (Plaintiff's Exhibit 2.) According to the notice, the charges were supposedly supported by the following "facts":
 1. Packard Grant monies were improperly utilized and converted by D. Weatherby for the purchase of a Ph.D. degree from LaSalle University in the area of Environmental Engineering.
 2. No line item was contained in the Packard Grant budget for "Professional Development."
 3. No prior approval was sought or obtained from the Packard Foundation to convert monies from other categories to a line item entitled "Professional Development."
 4. Misuse of the CSU issued American Express card by initially charging this expense to the corporate card. The American Express corporate card was issued for the purpose of business travel. All users were advised that the card was not a "credit card"; that credit was not extended to the user and users would not be subject to a "credit limit."
 The card agreement entered into expressly provided that the card was issued for "business travel only." [Plaintiff's Exhibit 2.]
Effective December 31, 1995, Weatherby was suspended with pay pending the outcome of a hearing. Id.
Pursuant to the terms of the CSU-AAUP Agreement for terminating a faculty member for cause, the matter went to an ad hoc committee for a hearing. The ad hoc committee that investigated the charges unanimously found that there was no evidence that Weatherby improperly used funds and there was inadequate evidence to support termination for cause on the grounds stated in the charges. The committee report stated in pertinent part:
 The Committee was unanimous in its view that Packard Grant funds were neither used to reimburse Dennis Weatherby for his payment of charges on his University issued American Express card nor to pay LaSalle University.
 The facts showed the following: After Dennis Weatherby initially requested the use of Packard Grant money to enroll in a degree program and to pay for courses at LaSalle University, it was determined that no money was available under the Packard Grant fund = 8384. Subsequently, enrollment in a degree program and for courses at LaSalle were paid from the ICWRM's Training Fund = 8388.
 The Committee collected information and heard testimony concerning LaSalle University. The Committee discussed the implications of the phrase "purchase a Ph.D. degree" * * *. In sum, while some Committee members expressed reservations about the advisability of Dennis Weatherby's decision to pursue a degree from LaSalle, as well [sic] the use of ICWRM money to pay tuition and other fees for such a degree, we found no evidence that Dennis Weatherby intended to "purchase a degree" or to obtain a degree without working for it.
 In the absence of a clear policy governing the use of faculty development funds and the accreditation status of degree programs acceptable to Central State University, there is no evidence that Dennis Weatherby improperly used funds.
* * *
 The Committee was unanimous in its view that Dennis Weatherby did use the American Express card in a way that violated the agreement which card users signed when they were issued the card. However, we were also unanimous in holding that policy statements concerning the use of the card were not consistent and that one of those policy statements (the memo from Gerald Shields, January 24, 1995) provided a loophole for use of the card for purposes other than business travel. Further, we were unanimous in our view that Dennis Weatherby did not benefit monetarily from his use of the card, that he made no attempts to "hide" what he was doing nor the purpose for which he was using the card, and that his using the card as he did, did not constitute gross negligence as set forth in the GROUNDS. [Plaintiff's Exhibit 75.]
While suspended from the University, Weatherby and Okereke sued CSU on November 12, 1996. Weatherby claimed that Smith and Love engaged in a personal vendetta to deny him tenure and terminate his employment with CSU. The amended complaint alleged three claims against CSU: breach of contract; negligent hiring; and defamation. With respect to the issue of immunity, Weatherby did not contend that Smith and Love acted outside the scope of their employment. Rather, he contended that their attempt to remove him from the CSU faculty for cause was undertaken with malicious purpose, in bad faith, or in a wanton or reckless manner. Despite the findings of the ad hoc committee that were published on February 27, 1997, the University never took any action to reinstate Weatherby.
The trial court bifurcated the issue of damages from the issues of civil immunity and liability. After a four-day trial, the parties filed post-trial briefs. The claim of negligent hiring was withdrawn. On November 18, 1998, the trial court issued a decision finding that Smith and Love were entitled to personal immunity, that the University had not defamed Weatherby, but CSU had breached its contract with him by failing to pay him for the 1996-1997 academic year, but not, as Weatherby had contended, by failing to pay him for the 1997-1998 academic year.
On February 7, 2000, the parties filed joint stipulations as to damages. On May 17, 2000, the trial court awarded Weatherby $10,101.84 in damages. Weatherby appealed, assigning as error the following:
 1. Whether the trial court erred in ruling that Herman Smith and Dianne Love were entitled to immunity under Ohio Rev. Code § 9.86 for attempting to remove Dennis Weatherby from the CSU faculty on false charges of misconduct?
 2. Whether the trial court erred in ruling that Central State University did not defame Dennis Weatherby by attempting to remove him from the CSU faculty on false charges of misconduct?
 3. Whether the trial court erred in ruling that the notice to Dennis Weatherby, dated December 28, 1995, of intent to terminate him for cause constitutes a constructive notice to terminate without cause in accordance with Art. 13.14 of the AAUP-CSU collective bargaining agreement?
In his first assignment of error, Weatherby contends the trial court erred in finding that Smith and Love were entitled to civil immunity as to his defamation claim. R.C. 2743.02(F) and 9.86 govern a determination as to whether or not a state employee is entitled to personal immunity. R.C. 2743.02(F) provides, in pertinent part:
 A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of his employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims, which has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action.
R.C. 9.86 states, in part:
 * * * [N]o officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.
While the issue of immunity is a question of law, consideration of specific facts is necessary to the determination. Nease v. Medical College Hosp. (1992), 64 Ohio St.3d 396, 400, citing Conley v. Shearer (1992),64 Ohio St.3d 284, 292; Long v. Bowling Green State Univ. (June 30, 1997), Franklin App. No. 96API12-1736, unreported. In this regard, matters involving credibility should be resolved by the trial court, and judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed as being against the manifest weight of the evidence. Brooks v. Ohio State Univ. (1996),111 Ohio App.3d 342, 350, citing C. E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279.
Malicious purpose encompasses exercising "malice," which can be defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified. Jackson v. Butler Cty. Bd. of Cty. Commrs. (1991), 76 Ohio App.3d 448, 453-454, citing Teramano v. Teramano (1966), 6 Ohio St.2d 117, 118; and Bush v. Kelley's, Inc. (1969),18 Ohio St.2d 89.
Bad faith has been defined as the opposite of good faith, generally implying or involving actual or constructive fraud or a design to mislead or deceive another. Lowry v. Ohio State Highway Patrol (Feb. 27, 1997), Franklin App. No. 96API07-835, unreported, quoting Black's Law Dictionary (5 Ed. 1979) 127. Bad faith is not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive. Id.
Finally, reckless conduct refers to an act done with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of harm and that such risk is greater than that necessary to make the conduct negligent. Hackathorn v. Preisse (1995), 104 Ohio App.3d 768, 771, citing Thompson v. McNeill (1990), 53 Ohio St.3d 102, 104-105, citing 2 Restatement of the Law 2d, Torts (1965) 587, Section 500. The term "reckless" is often used interchangeably with the word "wanton" and has also been held to be a perverse disregard of a known risk. Jackson, citing Thompson, at 104, fn. 1, and Poe v. Hamilton (1990), 56 Ohio App.3d 137, 138. As to all of the above terms, their definitions connote a mental state of greater culpability than simple carelessness or negligence. See Jackson, supra, at 454.
Here, the issue of whether Smith and Love were entitled to immunity requires an examination of the motives behind the actions taken against Weatherby. The charges against Weatherby centered on allegations that he had improperly used grant monies to purchase an advanced degree from an unaccredited institution. These charges went to the very core of Weatherby's personal and professional integrity. At trial, Weatherby attempted to show that these charges were utterly false, trumped up, and so lacking in any factual basis that, even if they were made in the course of Smith and Love's employment, Love and Smith knew they were false or failed to make any effort to determine the truth before making such accusations.
In its decision, the trial court did not discuss any of the evidence concerning Smith and Love's intent in taking the actions that they did. However, at one point in the trial, the trial judge intervened to question Love about her claim that Weatherby had used Packard Grant funds without authorization.
 THE COURT: Excuse my interruption, but looking at Exhibit BB, your letter of November 20, to Dr. Willie Houston
THE WITNESS: Yes.
 THE COURT: — the third sentence says that subsequently, the request was approved by Victor Okereke and Dr. Willie Washington.
THE WITNESS: Yes.
THE COURT: Where did you get that information?
 THE WITNESS: On the on the attachments, Your Honor. If you will look at let me see Page 5 of the exhibit, this is Mr. Weatherby's letter to Dr. Okereke requesting use of funds.
 THE COURT: Doesn't that say to the note by Okereke, doesn't that say, if funds are available?
 THE WITNESS: Approved if funds are available from the Packard Project.
 So he was approving the expenditures of funds, if the funds were there, yes.
 THE COURT: If they were available from but they weren't.
 THE WITNESS: I don't think they knew that. I don't think that was known then. That was known later that the funds were not available. When usually when we put a requisition in for payment, it has to go to budget, and budget determines whether there is enough money in the grant to pay for whatever expenditure you're requesting. Then they say yea or nay.
 THE COURT: Would you go to the fourth page of that exhibit.
THE WITNESS: Yes.
 THE COURT: There has been previous testimony that fund 8384 was Packard money.
THE WITNESS: Yes.
 THE COURT: 8388 is not from the Packard Foundation, but rather part of the normal budget of the department or center?
 THE WITNESS: 8388 is a training grant that is used to pay for visiting faculty. Like if we have people from Korea or anywhere to come to take classes, we have we offer, like, special courses in the center for water resource management. And 8388 would be the tuition that they that fund consists of tuition that they paid for classes and so forth.
 So that's what the training fund was set up for, not to pay for not to pay for tuition costs for faculty.
 THE COURT: It was approved; was it not? Somebody approved it.
THE WITNESS: Somebody approved it, yes.
BY MS. WRIGHT:
Q. And who approved it?
 THE COURT: And that was sending a check out of the wrong fund?
THE WITNESS: Yes, but somebody approved it.
THE COURT: But it was not Packard money?
 THE WITNESS: The original when I earlier when I was questioned about this particular purchase requisition, I didn't understand basically what they whether they it seemed to me that they got it from 8388, but then, like, there was a lot of scratch-outs and initials and stuff. I wasn't sure [Tr. Vol. III, at 785-788.]
The trial court also questioned Love about her statement that Weatherby requested certain grant monies "for the purchasing of a Ph.D. degree from LaSalle University." (Plaintiff's Exhibit 67.)
 THE COURT: Let me jump in again. Let's assume LaSalle was the diploma mill.
 Do you have any knowledge that Mr. Weatherby knew of that —
THE WITNESS: No.
 THE COURT: — and assumed that he wouldn't have to do any work and get the Ph.D just for the money?
 THE WITNESS: He said that in his letter. He said that in his letter, he said that he outlined to Dr. Okereke on Exhibit 67, Your Honor
THE COURT: What's the number?
THE WITNESS: Exhibit 67.
MR. FORG: Plaintiffs' Exhibit 67.
THE WITNESS: On Page 6.
 THE COURT: Doesn't Page 6 negate the idea that all he has to do is pay LaSalle and he automatically gets a Ph.D?
 THE WITNESS: No, we were looking at complete degree studies without any classroom attendance required. I picked up on the time limits and not going to class. [Tr. Vol. IV, at 1002-1003.]
If believed, the trial court could have concluded from Love's testimony that Love was not acting with a sinister motive or with the intent to harm or mislead, but, rather, honestly, but mistakenly, believed Weatherby had misused grant monies to obtain an advanced degree from a diploma mill.
The trial court also concluded that, with respect to the defamation claim, plaintiffs failed to prove that the "remarks in question" were defamatory or that they were made with actual malice. Given the trial court's ultimate decision regarding immunity, the above referenced statements, and the trial court's finding with respect to the defamation claim, we presume that, in matters of credibility, the trial court found Love's testimony to be credible.[1] Even though the ad hoc committee eventually found insufficient evidence to support the charges against Weatherby, if Love's testimony is to be believed, there is some evidence in the record that would support a finding that Love's decision to initiate an investigation into Weatherby's use of a university charge card and the potential misuse of grant monies to pay for his enrollment in an unaccredited institution was taken for legitimate reasons related to the business of CSU. In response to the question:
Q. Why did you want the matter investigated?
 A. Because when I became director, I was actually responsible for the budgets, you know, for the grants and the projects. And I wasn't sure that this was a valid expenditure for — for the Packard Grant from looking at the budget. * * * [Tr. Vol. III, at 778.]
On appeal, we are not to substitute our judgment for that of the trial court in matters of credibility. Therefore, given Love's testimony that she was "casually" looking through the Packard Grant file and came across what appeared to be potential misuse of grant monies, it was not error for the trial court to find that Love was entitled to immunity.
The evidence with respect to Smith's motivation is even sparser. Smith became angry with Okereke and Weatherby over perceived incompetence in handling the student who was short credit hours. Smith contacted legal counsel for the purpose of determining how the University could terminate Okereke and Weatherby. There was no evidence that Smith acted with malice, bad faith or in a reckless or wanton manner. The first assignment of error is not well-taken.
In his second assignment of error, Weatherby argues that, even if Smith and Love are entitled to personal immunity, the University is liable for the actions of Smith and Love under a theory of respondeat superior. Weatherby argues that the University ratified Smith and Love's defamatory conduct by bringing false charges of misconduct and by failing to take any action after Weatherby's exoneration by the ad hoc committee. The University responds by arguing that, even if the statements were defamatory, the trial court found that they were made within the course of Smith and Love's employment and, as such, were protected by a qualified privilege.
A defamatory statement generally is defined "as a false * * * publication, made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." A B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. Constr. Trades Council (1995), 73 Ohio St.3d 1,7; see, also, Dale v. Ohio Civ. Serv. Emp. Assn. (1991), 57 Ohio St.3d 112,117; Matalka v. Lagemann (1985), 21 Ohio App.3d 134, 136; 3 Restatement of the Law 2d, Torts (1977) 156, Section 559 and Comment b. The Restatement explains that a communication is defamatory if: (1) it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him; (2) it exposes another to hatred, ridicule, or contempt; or (3) it tends to disparage another by reflecting unfavorably upon his personal morality or integrity. Id.
We are at a loss to understand the basis for the trial court's finding that plaintiffs failed to prove the communications were untrue or that the publication of such comments caused injury to his reputation. As discussed above, the statements made by Dianne Love that Weatherby misappropriated grant monies to purchase an advanced degree formed the basis of the charges that were brought in an attempt to have him dismissed from his employment for cause. The ad hoc committee formed to investigate the charges unanimously found that there was no evidence that Weatherby improperly used funds or that he intended to purchase a degree without working for it.
The trial court went on to rule, however, that, even if the statements made against Weatherby were defamatory, Smith and Love were protected by a qualified privilege. A communication made in good faith between an employer and an employee or between two employees concerning the conduct of a third employee concerning a matter of common interest is qualifiedly privileged. Gray v. General Motors Corp. (1977), 52 Ohio App.2d 348. Where a qualified privilege exists, the plaintiff must show actual malice in order to recover for defamation. Springer v. Physician Sales and Service (Aug. 28, 1998), Montgomery App. No. 16940, unreported. A finding of malice in the context of defamation requires a clear and convincing showing that the defendant knew the statement was false or acted with reckless disregard as to the statement's truth or falsity. Jacobs v. Frank (1991), 60 Ohio St.3d 111, paragraph two of the syllabus.
In this case, the question of actual malice again hinged on a determination of Love's credibility. As discussed previously, the trial court apparently believed Love's testimony that her inspection of the files led her to believe Weatherby had improperly used grant monies to purchase an advanced degree in which he would not be required to attend class. On the advice of legal counsel, Love subsequently contacted the Packard Grant foundation to ascertain if grant monies could be used for degree studies, and she later contacted the Federal Department of Education to ascertain if LaSalle University were an accredited institution. (Plaintiff's Exhibits 72 and 69.) The trial court could have inferred from this evidence that Love was not acting with reckless disregard as to the truth or falsity of her accusations. The second assignment of error is not well-taken.
In his third assignment of error, Weatherby argues the trial court erred in finding that the December 28, 1995 notice to terminate Weatherby's employment for cause was constructively a notice to terminate without cause. Because the University's contract makes no provision for constructive notice of nonreappointment, we agree.
The CSU-AAUP Agreement provides for the termination of a regular faculty member during his probationary period either with cause or without cause. Under Article 13.14, a nontenured faculty member may be terminated without cause ("non-reappointment"), but only if he receives appropriate written notice of that termination. Under Article 17.1, a faculty member may be terminated at any time for "just cause."
It is uncontroverted that Weatherby was suspended with pay on December 28, 1995, effective December 31, 1995, and that the letter he received served as notice of the University's intent to terminate him for cause pursuant to Article 17.1. (Plaintiff's Exhibit 2.) After the ad hoc committee unanimously recommended against termination for cause, the University never took any final action to terminate Weatherby for cause. Nor did the University follow through with official, formal steps to terminate Weatherby's employment without cause. Because Weatherby was not a tenured professor, the CSU-AAUP Agreement provided a simple mechanism by which the University could terminate his employment: serve notice of nonreappointment pursuant to Article 13.14. However, not until September 10, 1997, when CSU notified Weatherby that the Board of Trustees voted to deny all pending applications for tenure, did the University alter Weatherby's employment status from that of suspended with pay. Under Article 13.17, a faculty member denied tenure would ordinarily be terminated at the end of the following academic year. Applying this reasoning, Weatherby's appointment automatically terminated on June 30, 1998, at the end of the 1997-1998 academic year.
The trial court, however, found that the December 28, 1995 letter suspending Weatherby with pay pending the outcome of a hearing served as constructive notice of the University's intention not to reappoint him. In doing so, however, the trial court ignored the plain language of the letter, stating that "[t]his letter serves as official notification of the University's intent to terminate your employment for cause" and suspending him "pending the outcome of a hearing." The University's notice that it intended to initiate proceedings to terminate Weatherby for cause pending the outcome of a hearing makes sense only in the context of an Article 17 "Termination for Cause" proceeding.
The plain language of Article 16.3 of the Agreement, titled "Notice of Non-Reappointment," specifies that, "[w]hen a Bargaining Unit member is not reappointed during the probationary period, the Bargaining Unit member will be given appropriate notice as specified in Article 13.14." Article 13.14 of the Agreement is titled "Appropriate Notice" and speaks of "[n]otice of intention to recommend non-reappointment." As a matter of law, the University's notice that it intended to initiate proceedings to terminate Weatherby for cause could not serve as a notice of non-reappointment. If we were to construe the notice of the University's intent to terminate Weatherby for cause as a notice of non-reappointment, there would be no need for a hearing. The evidence was clear and unequivocal that the University failed to follow its own procedures in not reappointing Weatherby. The third assignment of error is well-taken, and the matter must be remanded for a determination of additional damages under the breach of contract claim.
Based on the foregoing, the first and second assignments of error are overruled, the third assignment of error is sustained, and the judgment of the Ohio Court of Claims is affirmed in part and reversed in part and the matter is remanded for further proceedings in accordance with this opinion.
 _____________ LAZARUS, J.
DESHLER and KENNEDY, JJ., concur.
[1] Smith did not testify.