[Cite as *Pittro v. Ohio Dept. of Transp.*, 2012-Ohio-6348.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

PATRICIA C. PITTRO, Exec., etc.

    Plaintiff

    v.

OHIO DEPARTMENT OF TRANSPORTATION

    Defendant

Case No. 2010-02243

Judge Clark B. Weaver Sr.
Magistrate Holly True Shaver

DECISION OF THE MAGISTRATE

{¶ 1} An evidentiary hearing was conducted in this matter to determine whether Gordon Proctor, Jack Marchbanks, and Herbert Ligocki are entitled to civil immunity pursuant to R.C. 2743.02(F) and 9.86.[1] This case arises out of a one-car automobile accident involving plaintiff's decedent, Samuel Pittro, at the interchange of Avery-Muirfield Drive (Avery Road) and State Route 161/U.S. 33 (U.S. 33) in Dublin, Ohio. Pittro drowned after his vehicle left Avery Road and submerged in a man-made pond in the infield loop of the interchange. Plaintiff contends that the action or inaction of defendant's employees regarding the design and construction of the interchange constitutes reckless conduct. Therefore, plaintiff requests a determination whether Gordon Proctor and Jack Marchbanks are entitled to personal immunity under R.C. 9.86 and 2743.02(F).

{¶ 2} Former R.C. 2743.02(F) states, in part:

---

[1]In her post trial-brief, plaintiff states that "based on the evidence presented at the hearing, plaintiff is no longer pursuing individual liability against Herb Ligocki."

{¶ 3} "A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims, which has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action."

{¶ 4} R.C. 9.86 states, in part:

{¶ 5} "[N]o officer or employee [of the state] shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 6} Herbert Ligocki, defendant's production administrator, testified that when a municipality, such as the City of Dublin, wishes to modify an access point to an interstate highway, the municipality must obtain a permit from the Ohio Department of Transportation (ODOT). (Plaintiff's Exhibit 65.) Ligocki explained that to begin the permit process, the municipality submits an "Interchange Justification Study" (study). The study does not include aesthetic design elements. ODOT's planning department then reviews the study, and if approved, the study is forwarded to the Federal Highway Administration (FHWA) for approval. Dublin's initial study was approved both by ODOT and FHWA in August 1997. (Plaintiff's Exhibit 12.) Larry Sutherland, ODOT's deputy director of roadway engineering, testified that the initial study did not include ponds or other aesthetic features. Once both ODOT and FHWA have approved the study, the municipality may commence designing the project. Once the design plans are

available, the municipality may then apply for a permit from ODOT. The improvement project was funded entirely by Dublin.

{¶ 7} On March 24, 1998, representatives from Dublin, ODOT, FHWA, and Dublin's consultant, Burgess and Niple, met for a presentation of the proposed design of the interchange. Sutherland testified that at this meeting Dublin introduced the idea of installing man-made ponds along with tall trees and large boulders, among other design features, in the infield of the interchange loops. Sutherland opposed the idea due to the proposed addition of roadside hazards, including hazards placed in the "clear zone." Sutherland explained that the clear zone is an area alongside the roadway that should be free of such hazards. The size of the clear zone varies depending upon the speed of the roadway and the feasibility of establishing a clear zone. According to Sutherland, the American Association of State Highway and Transportation Officials' Roadside Design Guide prohibits the introduction of artificial hazards, including man-made ponds, to the right-of-way, which includes the infield loops. Sutherland testified that all of the issues with trees and boulders in the clear zone were gradually resolved leaving whether ponds should be installed as the only outstanding issue.

{¶ 8} According to both Ligocki and Sutherland, at that time, ODOT had no policy or rule regarding man-made aesthetic ponds in interchange loops. As a result, Ligocki contacted departments of transportation of other states regarding ponds in the infield loops of interchanges. Despite Sutherland's objections, Ligocki approved the concept of ponds on July 16, 1998. (Plaintiff's Exhibit 19.) Ligocki explained that the clear zone along the loop ramp was 30 feet and that the ponds were going to be located about 100 feet away from the road. Sutherland estimated the clear zone along the loop ramps to be about 40 feet. According to Ligocki, the clear zone for Avery Road was 18 inches behind the curb because the speed limit was only 35 miles-per-hour and there was a curb and sidewalk along the roadside. Sutherland estimated the clear zone along Avery Road to be 18 to 24 inches. Both Sutherland and Ligocki testified that as a result of the low speed and curb along the roadside, a guardrail was not required along Avery Road.

{¶ 9} Sutherland asserted that only ODOT's District 6 office, which included Ligocki, had approved the concept of ponds in the infield loops of the interchange. Sutherland explained that ODOT's Central office had not approved any concept of ponds and in his opinion, in the absence of a statewide policy, it was ODOT Central's responsibility rather than that of a district office to approve the concept of ponds. Ligocki believed that ODOT District 6 had the authority to approve the plans.

{¶ 10} On August 7, 1998, Dublin submitted preliminary design and schematic information regarding the interchange improvement project to Ligocki. (Plaintiff's Exhibit 22.) The design plans included ponds in the infield loops of the interchange. Sutherland felt that Ligocki was ignoring his concerns regarding the safety issues with man-made ponds in the infield loops. As a result, on September 3, 1998, he and another ODOT engineer, Dirk Gross, authored a memorandum for Jack Marchbanks, District 6 Deputy Director and Ligocki's supervisor, detailing their objections to the ponds in the infield loops of the interchange. (Plaintiff's Exhibit 14.) In the memorandum, Sutherland and Gross warned that "[l]ocating a pond in the center of the loop will inevitably result in a vehicle entering the pond and submerging." *Id.* Sutherland also warned that the steep slopes toward the center of the infield loops will "funnel" vehicles to the center of the loops where the ponds will be located. *Id.*

{¶ 11} Marchbanks testified that Ligocki approved the concept of ponds without his knowledge and without concurrence from ODOT Central. Marchbanks explained that, according to policy in effect at the time, for a permit to be issued, Dublin needed both ODOT Central and District 6's approval of the plans. According to Marchbanks, Sutherland's September 3, 1998 memo "hit like a bombshell." Despite Sutherland's objections, Marchbanks, who is not an engineer, believed that ponds could be safe so long as they were kept outside of the clear zone with adequate safety mechanisms, such as a barrier, in place.

{¶ 12} On December 8, 1998, Dublin submitted its final design for the improvement project to ODOT for review. (Plaintiff's Exhibit 28.) Marchbanks testified that at that time, ODOT was transitioning to a new administration under a new director, Gordon Proctor. As a result, he sought Proctor's input on the impasse that had developed between ODOT engineers Ligocki and Sutherland.

{¶ 13} Proctor testified that he became aware of Sutherland's objections in January 1999. On January 28, 1999, another meeting was held between representatives from Dublin, Burgess and Niple, ODOT District 6, and ODOT Central. Sutherland and Ligocki both attended the meeting. (Plaintiff's Exhibit 32.) At the meeting, Sutherland again expressed opposition to the ponds; Ligocki expressed support for the ponds. According to Ligocki, during the meeting, Dublin threatened to involve then Ohio Governor Taft in the dispute. Ligocki believed that the ponds were appropriate given Governor Taft's Urban Design Initiative, which required ODOT to consider aesthetics in design proposals. Proctor requested that Sutherland put his concerns with Dublin's proposed design in writing, which he did in an email on February 8, 1999. (Plaintiff's Exhibit 34.) In the email, Sutherland again warned that installing ponds in the infield loops would lead to vehicles submerging in the ponds. *Id.* Sutherland also noted that 20 percent of vehicles that leave the roadway are unable to recover in the clear zone; meaning 20 percent of vehicles that leave the roadway travel beyond the clear zone. *Id.*

{¶ 14} Proctor, who is not an engineer, testified that despite Sutherland's objections, he felt the ponds could be safe so long as the design also included safety features. Proctor believed that Sutherland was exaggerating his safety concerns with the ponds. Proctor subsequently requested that Marchbanks find a compromise between Ligocki and Sutherland regarding the ponds.

{¶ 15} Once it became apparent that Sutherland and Ligocki could not reach a compromise regarding the ponds, Sutherland sought input from FHWA. Gross explained that FHWA typically defers to ODOT policy and only reviews proposals to

determine that ODOT followed its own internal policies when issuing permits. On March 16, 1999, Sutherland and Ligocki met with representatives of FHWA. According to both Ligocki and Sutherland, FHWA verbally expressed opposition to the proposed ponds. As a result, Ligocki withdrew his support for the ponds and informed Dublin of ODOT's newly-unified position opposing the proposed ponds. According to Ligocki, Dublin's representatives were very upset and it was obvious that Dublin would take the matter "up the ladder." Ligocki also asserted that throughout the negotiations, Dublin threatened to commence construction on the improvement project without ODOT approval.

{¶ 16} On May 12, 1999, at the request of Dublin, Proctor and representatives from Dublin met with United States Representative Pat Tiberi. (Plaintiff's Exhibit 49.) At the meeting, Proctor and Dublin reached a compromise to install grates below the surface of the water; however, Proctor was unable to recall who suggested installing such grates. Dublin agreed to pay for the cost of the grates up to $100,000 with ODOT covering any costs that exceeded that amount. (Plaintiff's Exhibit 49.) Sutherland testified that once he learned of the compromise, he informed Proctor that such a solution simply was not economically feasible or realistic from an engineering perspective. Proctor, however, concluded that Dublin would not relent on the concept of ponds and that "we had to have ponds."

{¶ 17} According to Marchbanks, after dismissing the idea of grates below the surface of the water, Dublin proposed to completely surround the ponds with barriers.

{¶ 18} Proctor testified that ODOT continued to propose options to Dublin to allow ponds and also ensure the safety of the traveling public. At a May 27, 1999 meeting, Dublin promised to make a "good faith" effort to comply with ODOT's safety request. However, Sutherland and Gross both testified that Dublin's City Engineer, Balbir Kindra, informed ODOT that Dublin may elect to proceed with the improvement project without ODOT's approval and that ODOT would have to sue to stop the improvement project.

Indeed, Sutherland's notes to Proctor from the meeting state that "Balbir mentioned that if they did not like what the architect proposes based on our offer, the City of Dublin will go ahead and build exactly what they have already proposed and if ODOT wants to sue them in court that would be your decision." (Plaintiff's Exhibit 52.) Kindra's minutes from a meeting between Dublin and ODOT state: "I emphasized that the continuous wall will probably not provide us aesthetic appearance. However, we will make a 'good faith' effort to reach a compromise. If not, we might have to proceed without ODOT concurrence." (Plaintiff's Exhibits 46 and 66.)

{¶ 19} After the May 27, 1999 meeting with Dublin, Sutherland agreed to allow ponds so long as such plans incorporated safety mechanisms, such as a protective barrier. Proctor and Marchbanks both testified that they understood that the ponds would be completely surrounded by barriers. In early June 1999, Ligocki informed Sutherland and Gross that the issues with the improvement project had been fully resolved. Marchbanks recalled reviewing project plans that included barriers completely surrounding the ponds in the interchange loops.

{¶ 20} Marchbanks testified that rather than follow ODOT's typical permitting process and issue a permit for Dublin to commence construction, ODOT and Dublin entered into a written agreement with the goal of strengthening ODOT's jurisdictional position over the interchange. Marchbanks explained that the question of control over the Avery Road side of the interchange was ambiguous because of the "Home Rule" in the Ohio Constitution. Proctor testified that he spoke with counsel to determine whether ODOT had control over the infield loops of the interchange. According to Proctor, counsel informed him that it was not clear whether Dublin or ODOT had control over the infield loops; however, Proctor was unable to recall the name of the attorney or whether the attorney worked for ODOT or the Ohio Attorney General's Office. As a result of the alleged ambiguity, Dublin and ODOT entered into an "AGREEMENT * * * TO IMPROVE AND MAINTAIN INTERCHANGE OF US 33/SR 161 AND AVERY-MUIRFIELD DRIVE." (Plaintiff's Exhibit 72.)

**{¶ 21}** The agreement states that "[i]f, at any time, it becomes necessary, in the opinion of the Director of Transportation to order the removal, reconstruction, relocation, or repair of any of the fixtures, or work performed within the general scope of work and change orders, if any under the Agreement, said removal reconstruction, relocation or repair work performed within the general scope and change order of this agreement, shall be completed wholly at the expense of the CITY, and be made as directed by the Director of Transportation." *Id.*

**{¶ 22}** At some point thereafter, ODOT became aware that Dublin was not installing any protective barrier along Avery Road to prevent vehicles from entering the ponds. Proctor testified that he did not seek out counsel to discuss the "agreement" and whether ODOT could force Dublin to install a barrier along Avery Road. Marchbanks testified that he concluded, based upon advice from counsel, that ODOT could not compel Dublin to install barriers along Avery Road.

**{¶ 23}** Proctor also admitted that after learning of an accident involving a vehicle leaving Avery Road and submerging in the pond in 2004, he did not consult with counsel whether ODOT could compel Dublin to install a barrier along Avery Road. Marchbanks admitted that after the 2004 accident he never reviewed the agreement and never asked counsel about ODOT's options for enforcing the agreement, although he stated that he did speak with counsel about ODOT's authority to install a barrier along Avery Road. According to Marchbanks, he was informed that ODOT lacked such authority.

**{¶ 24}** In February 2008, after Pittro's accident, Dublin and ODOT met to discuss installing guardrails along Avery Road.2 Gross, who attended the meeting, testified that Dublin needed to obtain a permit from ODOT to perform work along Avery Road at the interchange. Indeed, the minutes from the meeting state that "Dublin will provide ODOT

with drawings which show the transition from the proposed wood timber guardrail to the existing bridge. ODOT will work with Dublin to approve and incorporate this design into a permit to do the work." (Plaintiff's Exhibit 63.)

{¶ 25} There is no dispute that Marchbanks and Proctor are employees of the state as defined in R.C. 109.36; however, plaintiff argues that allowing ponds to be constructed in the infield loops of the interchange without barriers along Avery Road constitutes reckless conduct. Plaintiff further argues that Proctor and Marchbanks' failure to inquire whether ODOT could compel Dublin to install a guardrail on Avery Road after an automobile left Avery Road and submerged in the pond in 2004 also constitutes reckless conduct. Defendant asserts that neither Marchbanks or Proctor acted recklessly.

{¶ 26} The issue whether Proctor and Marchbanks are entitled to immunity is a question of law. *Nease v. Medical College Hosp.*, 64 Ohio St.3d 396 (1992), citing *Conley v. Shearer*, 64 Ohio St.3d 284, 292 (1992). The question whether they acted outside the scope of their employment or in a wanton or reckless manner is one of fact. *Tschantz v. Ferguson*, 49 Ohio App.3d 9 (10th Dist.1989). Plaintiff bears the burden of proving that the state employees should be stripped of immunity. *Fisher v. University of Cincinnati Med. Ctr.*, 10th Dist. No. 98AP-142 (Aug. 25, 1998).

{¶ 27} In the context of immunity, in order to find reckless conduct there must be a showing that the employee perversely disregarded a known risk. *See, e.g., Jackson v. Butler Cty. Bd. of Cty. Commrs.*, 76 Ohio App.3d 448, 453-454 (12th Dist.1991); *Lowry v. Ohio State Highway Patrol*, 10th Dist. 96API07-835 (Feb. 27, 1997); *Hackathorn v. Preisse*, 104 Ohio App.3d 768, 771 (9th Dist.1995); *Thompson v. McNeill*, 53 Ohio St.3d 102 (1990). The term "reckless" refers to when one "'does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or

---

[2]The evidence of a subsequent remedial measure was not admitted to prove defendant's employees' recklessness, but instead, the evidence was admitted pursuant to Evid.R. 407 to prove that defendant had control over the decision to place guardrails along Avery Road.

having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.'" *Id.*, quoting *Thompson*, *supra*, at 104-105. *See also Habeeb v. Ohio House of Representatives*, 10th Dist. No. 07AP-895, 2008-Ohio-2651.

{¶ 28} R.C. 5521.13 provides, in relevant part:

{¶ 29} "(A) Except as provided in division (B) of this section, whenever a political subdivision submits to the director of transportation any documents, reports, plans, or other materials relating to a proposed highway improvement project on the state highway system or relating to a road construction or improvement in accordance with section 5535.15 of the Revised Code, the director shall review and approve such documents, reports, plans, or other materials within sixty days after the date of submission if all of the following apply:

{¶ 30} "(1) The entire cost of the project is to be funded privately or by a local subdivision;

{¶ 31} "(2) The documents, plans, reports, or other materials relating to the project comply with applicable design development criteria of the Ohio department of transportation and the federal highway administration;

{¶ 32} "(3) Except in regard to a project proposed under section 5535.15 of the Revised Code, the proposed project has been approved in concept by the appropriate local legislative authority."

{¶ 33} Based upon the evidence presented at the hearing, the court finds that plaintiff failed to prove that either Proctor or Marchbanks perversely disregarded a known risk by not forcing Dublin to install a guardrail along Avery Road. Indeed, pursuant to R.C. 5521.13, where a project is funded by a local subdivision and approved by a local legislative authority, the director of ODOT shall approve such

documents, reports, plans, or other materials so long as such documents comply with applicable design development criteria of ODOT.

{¶ 34} Ligocki and Sutherland both testified that a guardrail was not required along Avery Road and that the clear zone was, at most, 24 inches beyond the curb. The ponds in the infield loops were located well beyond the clear zone along Avery Road. Furthermore, ODOT did not have a policy in place that would have prevented the installation of ponds in the infield loops.[3] Moreover, both Proctor and Marchbanks believed that Dublin would install barriers to completely surround the ponds.

{¶ 35} Plaintiff argues that Proctor and Marchbanks acted recklessly when they allowed Dublin to install ponds in the infield loops even after ODOT became aware that Dublin would not install barriers that completely surrounded the ponds. Marchbanks testified that he consulted with legal counsel and that based upon the advice he received, it was his belief that the "Home Rule" of the Ohio Constitution presented a serious obstacle to ODOT in any effort either to compel Dublin to install barriers along Avery Road or to prevent the installation of ponds in the infield loops of the interchange. Indeed, based upon previous conversations with counsel regarding the Home Rule, Proctor believed that ODOT's authority over the Avery Road side of the interchange was ambiguous.

{¶ 36} Likewise, after the fatal accident in 2004, Marchbanks again consulted with counsel, although he admitted that he never reviewed the agreement between Dublin and ODOT. Proctor also requested an investigation of the accident but ultimately determined that no safety issue with the road existed. Proctor also admitted that he did not review the agreement or consult with counsel at that time.

{¶ 37} Based upon the evidence presented, the court finds that Marchbanks and Proctor made reasonable efforts to prevent the installation of the ponds and to compel the installation of a guardrail both during construction and after the first fatal accident.

---

[3]Subsequent to the events in this case, ODOT enacted a policy prohibiting the construction of aesthetic ponds in the infield loop of an interchange.

The court further finds that both Marchbanks' and Proctor's efforts to obtain advice of legal counsel regarding ODOT's right to compel the installation of guardrails was also reasonable, under the circumstances.    Both Marchbanks and Proctor testified that Dublin refused to install guardrails and that ODOT would have to bring suit to compel Dublin to do so.  Thus, the evidence convinces the court that Proctor would have had to bring an action on behalf of ODOT to compel the installation of guardrails.    Proctor consulted counsel and he was advised that it was unclear whether ODOT would prevail in such litigation.    According to Proctor, he elected not to proceed with litigation due to his fear that an adverse result could have a significant effect on other similar projects throughout the state.    In short, the magistrate recommends that the court find Marchbanks and Proctor are entitled to civil immunity.

{¶ 38} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i).  If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed.  A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
HOLLY TRUE SHAVER
Magistrate

cc:

Daniel R. Forsythe                 Rebecca Roderer Price
Peter E. DeMarco                   Robert G. Schuler
Assistant Attorneys General       Timothy T. Tullis
150 East Gay Street, 18th Floor     Capitol Square Office Building
Columbus, Ohio 43215-3130       65 East State Street, Suite 1800
                                      Columbus, Ohio 43215-4294

003
Filed October 24, 2012
Sent to S.C. Reporter February 28, 2013