OPINION
{¶ 1} The Ohio House of Representatives ("House"), defendant-appellant, appeals from a judgment of the Ohio Court of Claims, in which the court found the acts of former House Representative Shirley Smith ("Smith") were not entitled to immunity because they were outside the scope of her employment with the House and were made with malice, in bad faith, and in a reckless manner. *Page 2 
 {¶ 2} In September 2005, Smith was a representative in the House for the Tenth District, which includes parts of Cleveland. Philip Habeeb and John Kraynick, plaintiffs-appellees, were employed as detectives with the Cleveland police department. At 5:00 a.m. on September 1, 2005, appellees executed a search warrant at a residence located in Cleveland but not within the boundaries of the House's Tenth District. Brandon McCloud, who was 15 years old, was a suspect in several crimes. McCloud's family members told appellees McCloud was not at the home. During the search of the residence, the officers discovered McCloud. During the incident, appellees shot and killed McCloud.
 {¶ 3} McCloud's family contacted Smith, and Smith visited the McCloud's home soon after the shooting, where she met and talked with McCloud's family members and toured the home. Smith also saw McCloud's autopsy photographs and read media accounts of the incident. Soon after meeting with McCloud's family, Smith, along with an acquaintance, Mark Olds, drafted a letter on her official House letterhead. In the letter, Smith made numerous statements, such as appellees were hit men, appellees were murderers, appellees turned McCloud's room into an execution chamber, appellees were on an execution assignment, appellees were death merchants, appellees should be prosecuted to the fullest extent of the law, a life sentence without the possibility for parole would be the appropriate sentence for appellees, Habeeb displayed hostility toward African-American males while in uniform, Habeeb had detained several members of the Black Panther Party and subjected them to unspecified indignities, appellees were malicious sharpshooters, and appellees would be getting away with cold-blooded murder if not convicted. Smith mailed the letter on September 6, 2005, to the Director of the *Page 3 
Department of Public Safety for the City of Cleveland, the mayor of Cleveland, the chief of the Cleveland police department, the Cleveland city prosecutor, and the Cuyahoga county prosecutor. Portions of the letter were also published in the Cleveland Plain Dealer and several other media outlets.
 {¶ 4} On August 30, 2006, appellees filed an action in the Court of Claims against Smith, seeking a determination that Smith was not entitled to governmental immunity for the allegedly defamatory statements she made in the letter. Pursuant to the court's directive, on October 2, 2006, appellees filed an amended complaint, naming the House as the sole defendant. A hearing solely on the immunity issue was held August 23, 2007. On October 1, 2007, the court issued a decision, finding that Smith was not entitled to immunity because she was acting outside of the scope of her employment with the House when she drafted and mailed the letter, and the letter was drafted with malice, in bad faith, and in a reckless manner. The House appeals the judgment of the trial court, asserting the following assignments of error:
 [I.] The Court of Claims erred in finding that Representative Smith was acting manifestly outside the scope of her employment as a state representative in drafting and sending the letter which forms the basis of Appellees' claims for defamation.
 [II.] The Court of Claims erred in not applying the "actual malice" standard in analyzing if Representative Smith acted with malice, bad faith or in a wanton or reckless manner.
 [III.] The Decision of the Court of Claims that Representative Smith acted with malice, bad faith and in a wanton and reckless manner is not supported by the manifest weight of the evidence. *Page 4 
 {¶ 5} We address all three of the House's assignments of error together, as they are related. The House argues in its first assignment of error that the trial court erred when it found that Smith was acting manifestly outside the scope of her employment as a state representative in drafting and sending the letter that forms the basis of appellees' claims for defamation. The House argues in its second assignment of error that the trial court erred when it failed to apply the "actual malice" standard in analyzing if Smith acted with malice, in bad faith, or in a wanton or reckless manner. The House argues in its third assignment of error that the trial court's finding that Smith acted with malice, in bad faith, and in a wanton and reckless manner was not supported by the manifest weight of the evidence.
 {¶ 6} R.C. 2743.02(F) provides, in pertinent part:
 A civil action against an officer or employee * * * that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims, which has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action.
 {¶ 7} R.C. 9.86 provides, in pertinent part:
 * * * [N]o officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner. *Page 5 
R.C. 9.86 is written in the disjunctive; thus, a governmental employee is not entitled to personal immunity if any one of the following is demonstrated: (1) the employee's actions were manifestly outside the scope of employment or official responsibilities; (2) if the employee acted with malicious purpose; (3) the employee acted in bad faith; or (4) the employee acted in a wanton or reckless manner.
 {¶ 8} A court's determination as to whether a person is entitled to immunity is a question of law. Morway v. Ohio Bur. of Workers'Comp., Franklin App. No. 04AP-1323, 2005-Ohio-5701, citing Nease v. Med.College Hosp. (1992), 64 Ohio St.3d 396, 400. To make that determination, however, the court must consider specific facts. Id., citing Lowry v. Ohio State Hwy. Patrol (Feb. 27, 1997), Franklin App. No. 96API07-835. In this respect, "matters involving credibility should be resolved by the trial court, and judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed as being against the manifest weight of the evidence." Morway, at ¶ 17, citing Brooks v. Ohio State Univ. (1996),111 Ohio App.3d 342, 350.
 {¶ 9} In the present case, we find that the trial court's finding that Smith acted with malice, in bad faith, and in a wanton and reckless manner was supported by the manifest weight of the evidence. The appellate standard of review on manifest weight of the evidence issues in a civil case is whether the record contains some competent, credible evidence in support of the trial court's decision. Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Const.Co. (1978), 54 Ohio St.2d 279, syllabus. *Page 6 
 {¶ 10} The letter in question in the current case provided, in full, as follows:
 A search warrant is not an execution warrant! That has to be made very clear. It should never be mistaken as such.
 A search warrant is signed by a judge for specific search of a property. The search warrant is not dispatched with an accompanying judge, jury and prosecutor. It is carried out by designated police officers to seek specifically detailed items. It is a tool to empower peace officers with the authority to gather evidence from a private property. Peace officers are armed with the search warrant as a tool to protect society.
 In the case of 15 year old Brandon McCloud, Officers John Kraynik [sic] and Philip Habeeb transposed their duties into judge, jury and prosecutor. Obviously, they mistook the search warrant signed by a judge as that of an execution warrant signed by the governor. Yet, no tangible evidence has been presented to validate firing of ten gun shots into the body of young Brandon McCloud.
 These two officers demonstrated that they could shoot with deadly accuracy as they turned the youngster's bedroom into an execution chamber. According to the Cuyahoga County's Coroner, Brandon McCloud was struck twice in the face, twice in the head, the groin, both thighs, chest and left arm. These two malicious accurate sharpshooters continued to fire across a small room until their execution assignment had been fulfilled.
 The City Prosecutor's preliminary report ruled justifiable action by these two death merchants. The community eagerly awaits Cuyahoga County Prosecutor Bill Mason to step in and overrule the City Prosecutor with the same vigor as he did in the Gerald Levert matter.
 Without question, excessive force (10 shots fired in a small room) was used. Nothing in this scenario suggests that Officers Kraynik [sic] and Habeeb were ever in danger or that this constituted a life-threatening situation.
 I am also dismayed at the thought that these officers were permitted to execute a property search at 5 a.m., which leads me to pose an important question. Was a supervisor present to ensure the safe and successful execution of the warrant, or *Page 7 
do departmental policies fail to provide for adequate oversight in these situations?
 Again, what is not clear is whether Brandon ever possessed or brandished a weapon during the confrontation. However, is it not unreasonable to think that an individual would, when violently awakened from his slumber in the early morning by others unknown and armed, react in a manner to protect his person and ensure his survival at the end of such an onslaught?
 Also disconcerting is the fact that this tragedy represents the most recent and horrific incident in an egregious pattern of behavior by Officer Habeeb, who, on two separate occasions that I am aware of, has displayed open hostility towards African-American males while in uniform. In one occurrence, Habeeb detained and subjected several members of the Black Panther Party to considerable indignities, including the organization's president. The assertion was that Habeeb was looking for another alleged Black Panther, who bore no physical resemblance to those he chanced upon that particular day. In yet another instance, Habeeb, acting on uncorroborated information in the course of investigating a burglary, falsely accused Khalid Samad and arrested Minister Richard Mohammed in connection to the aforementioned crime, a charge which was subsequently dropped.
 The men responsible for the death of Brandon McCloud have been wholly silent in this matter, purportedly because they are prohibited from discussing the case until later this week, when they will appear before investigators to offer their account of the events that transpired. Was it the intent of those charged with investigating this case to purposely delay these proceedings so as to allow these officers more an adequate amount time [sic] to corroborate their stories? Either way, it seems to many, myself included, that these individuals have been silent far too long.
 I must again impress upon you that a young, albeit troubled, life has been cut short. However, despite his recent involvement with the criminal justice system, it is unfair to summarize Brandon's life as that of "a street thug," as Bob Beck asserted in an article published by The Plain Dealer on September 2, 2005. We can never know the true nature of the man Brandon would have become or the totality of his *Page 8 
experiences because he was brutally slain before he could begin to embark upon his life's journey.
 These two hit men should be prosecuted to the full extend [sic] of the law. I will then take on a personal crusade to spare their lives as I unequivocally oppose the death penalty. Life without the possibility for parole would be the appropriate sentence in the case of Mr. John Kraynik [sic] and Mr. Philip Habeeb. But to do nothing or to allow them to distance themselves from the tragic events of September 1, 2005, and ultimately, their role in the death of Brandon McCloud without exacting some punishment for their actions means that they will have gotten away with cold-blooded murder, pure and simple.
 {¶ 11} Before addressing whether the trial court's judgment finding that Smith acted with malice, in bad faith, and in a wanton and reckless manner was supported by the manifest weight of the evidence, we must address the House's argument raised in its second assignment of error that the trial court erred when it failed to apply the "actual malice" standard in analyzing whether Smith acted with malice, in bad faith, or in a wanton and reckless manner. The House contends that, when analyzing the immunity of a state officer, pursuant to R.C. 9.86, and the tort alleged is defamation against another public figure, a court should use the same "actual malice" standard as used in defamation cases. A finding of malice in the context of defamation requires a clear and convincing showing that the defendant knew the statement was false or acted with reckless disregard as to the statement's truth or falsity. Jacobs v.Frank (1991), 60 Ohio St.3d 111, paragraph two of the syllabus.
 {¶ 12} In defining "malice," "bad faith," and "reckless," the Court of Claims used our definitions from Lowry, supra. In Lowry, we defined "malice" as the "`willful and intentional design to do injury, or the intention or desire to harm another, usually *Page 9 
seriously, through conduct which is unlawful or unjustified.'" Id., quoting Jackson v. Butler Cty. Bd. of Cty. Commrs. (1991),76 Ohio App.3d 448, 453-454. We defined "bad faith" in Lowry as "`a design to mislead or deceive another, * * * not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.'" Id., quoting Black's Law Dictionary (5 Ed. 1979) 127. We defined the term "reckless" in Lowry as being when one "`does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.'" Id., quoting Thompson v. McNeill (1990), 53 Ohio St.3d 102, 104-105.
 {¶ 13} The Court of Claims did not specifically include in its definition of "malice" when the defendant knew the statement was false or acted with reckless disregard as to the statement's truth or falsity, which is the definition urged by the House. However, the House fails to acknowledge that the Court of Claims concluded later in its decision:
 * * * Smith's statements characterizing plaintiffs as "hit men" and "death merchants" who committed "cold blooded murder" were made with "a reckless disregard" with respect to both the truth or falsity of the statements and harm to the detectives' reputations and careers.
(Emphasis added.) Therefore, it is apparent that the court, in fact, reviewed Smith's statements under the "reckless disregard for truth or falsity" standard urged by the House. For this reason, the House's argument that the Court of Claims should have used this standard cannot be sustained. *Page 10 
 {¶ 14} However, insofar as the House also seeks to incorporate the "clear and convincing evidence" standard, as used in defamation cases, we fail to find any court that has ever determined that malice under R.C. 9.86 must be demonstrated based upon "clear and convincing" evidence. As the House directs us to no authority, and we can find none, we reject the House's contention.
 {¶ 15} We also note we make no specific finding herein that the "actual malice" definition used for purposes of determining a defamation claim is the sole definition of "malice" applicable to cases determining immunity pursuant to R.C. 9.86. Although in Long v. Bowling Green StateUniv. (June 30, 1997), Franklin App. No. 96API12-1736, we included, as one definition of "actual malice," one's acting with reckless disregard as to the truth or falsity of a statement, in numerous other immunity cases under R.C. 9.86, this court has used the same definitions for "malice," "bad faith," and "reckless" as used by the Court of Claims in the present case, without any reference to whether the state employee acted with reckless disregard as to truth or falsity. See, e.g.,Caruso v. State (2000), 136 Ohio App.3d 616, 620; Morway, supra, at ¶ 19; Okereke v. Central State Univ. (Mar. 29, 2001), Franklin App. No. 00AP-686; Marinucci v. Ohio Dept. of Transp. (Jan. 18, 2000), Franklin App. No. 99AP-500; Lowry, supra. Further, we gave no indication inLong that proof of reckless disregard as to the truth or falsity of the statement was required to demonstrate malice; rather, it was one of three different definitions we gave for "malice" for purposes of determining immunity under R.C. 9.86. For these reasons, we find the trial court used the proper standards for determining whether Smith acted with "malice."
 {¶ 16} The House's main argument is that the trial court's finding that Smith acted with malice, in bad faith, and in a wanton and reckless manner was not supported by the *Page 11 
manifest weight of the evidence. After reviewing the record, we find the trial court's judgment was not against the manifest weight of the evidence. Smith was the only witness to testify at the immunity hearing. With regard to the incident at issue, Smith went to McCloud's house after the incident and talked to "Uncle Willy" and "Uncle Melvin." Uncle Willy gave her a version of the facts, and she stated she based her letter on what Willy had told her, photographs of McCloud shown to her by the family, information gleaned from the media, and her own tour of the home. Smith testified that McCloud's family told her they believed the police officers had taken advantage of their grandmother and had given McCloud no warning that they were in the house. Smith stated she was trying to make the family "feel better" by writing the letter and trying to get the family "justice" based upon a system they did not trust. She also indicated that a friend of hers, Mark Olds, wrote portions of the letter. Although she stated the letter was based "100%" on the information given to her by Willy, she admitted that he was not at the home at the time of the shooting.
 {¶ 17} As for the specifics of the letter, she stated she was told by the family that the police did not have a valid search warrant, but she admitted she made no inquiry prior to writing the letter as to whether the police's search warrant was actually valid. However, based upon her perception of bias in the African-American communities, she claimed she would not find it suspicious that the police officers would have a fake warrant. Further, when she used the words "execution chamber" in the letter, she stated that this term appeared to fit the situation based upon what the family had told her. When asked in the hearing why she labeled the officers as murderers if all she wanted was a fair investigation, her only response was that she was trying to get justice for the family. She *Page 12 
admitted that all of the media accounts of the incident indicated that the teen had a knife in his hands when he was shot, but the family told her he did not have a knife. She also admitted that, although she accused Habeeb of being involved in the arrest of Black Panther members in her letter, she had no knowledge of such. She further admitted that, although she claimed in the letter that Habeeb had falsely accused Khalid Somad and arrested Richard Mohammed, she did not actually know whether Habeeb had done those things.
 {¶ 18} Smith further stated it was "her opinion" that the officers were "hit men," as stated in her letter. She stated she was only conveying the family's thoughts when she called the officers "murderers" in the letter. When she stated the officers had received an "execution assignment," she based the statement on what the family had told her and the way the incident appeared. When asked why she made some of the statements in the letter without any specific knowledge of them, she stated that because she received her information from the family, in her opinion, the information was true.
 {¶ 19} The House argues that there was no evidence of "malice," "bad faith," or "recklessness" because the evidence presented showed she wrote the letter to try to help the family or to make certain a thorough investigation was completed, and she did not have any sinister or personal motive, did not harbor any ill will toward the officers personally, did not understand the investigative process, and did not intend to mislead anyone. The House maintains that Smith may have been wrong in her facts and in her opinions, but she did not try to deceive anyone for any ulterior motive.
 {¶ 20} However, the Court of Claims clearly did not believe Smith's assertion of good faith. The court specifically found her testimony regarding her reason for writing the *Page 13 
letter was not credible. The Court of Claims found that the statements in Smith's letter did not support her assertion that she wrote the letter in response to the family's request that the shooting be properly and "fully" investigated. The Court of Claims also noted that Smith was aware that Willy, who conveyed the information about the incident to her, was not in the house at the time of the shooting. The court further found that Smith made her allegations within days of the shooting before any official investigations could be completed. The court concluded that there was no evidence to suggest that Smith was furnished with information that would allow any reasonable person to conclude that the statements of fact she published in her letter were true. The court did not believe that Smith's statements could have been prompted by honest mistake.
 {¶ 21} We concur with the Court of Claims' assessment of the evidence, and we have no reason to question its credibility determination. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact.State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of syllabus. The Court of Claims found Smith's testimony not credible. Smith stated in the letter that the officers mistook the search warrant as an "execution warrant"; the officers turned the teen's room into an "execution chamber"; the officers were "two malicious accurate sharpshooters"; the officers were "death merchants"; and the officers shot until their "execution assignment" had been fulfilled. Smith also called the officers "two hit men," and said they committed "cold-blooded murder, pure and simple." However, in her testimony, Smith gave no specific explanation as to what Willy stated to make her believe the two officers acted maliciously and entered the residence with the premeditated intent *Page 14 
to murder McCloud. The terms "death merchants," "execution assignment," and "hit men" intonate aforethought and suggest that the officers' sole purpose of their assignment was to kill McCloud. Although Smith may have been of the personal opinion that the officers acted inappropriately in some manner, perhaps by using deadly force inappropriately or in executing the warrant at an inappropriate time of day, such beliefs cannot justify the patent accusation that the officers possessed the calculated criminal animus to murder McCloud when they entered the home. Without evidence to suggest otherwise, it strains credibility to believe that Smith could have been of the honest and good-faith opinion that the two officers had acted in the manner she described.
 {¶ 22} Smith also stated in the letter that there had been no evidence presented to validate the firing of ten gunshots, and she concluded that "excessive force" was used "without question." However, Smith made these statements despite the fact that she admitted in her testimony that, in every media account of the incident, it was mentioned that the teen had a knife in his hand. Although her remark in the letter, that it was not clear whether McCloud was armed, may well show reasonable and tempered scrutiny on her part, Smith does not explain how she then could come to such a contradictory conclusion that excessive force was used "without question."
 {¶ 23} Moreover, with regard to the specific accusations leveled against Officer Habeeb, Smith stated in her letter that Habeeb had displayed open hostility to African-Americans, including subjecting members of the Black Panthers to "indignities," falsely accusing one man, and falsely arresting another man. However, Smith explicitly admitted in her testimony that she had no knowledge that any of these statements were true. Smith does not further illuminate her reasons for setting forth such assertions in the letter, *Page 15 
although her testimony suggests that Olds may have drafted this part of the letter. Notwithstanding, given Smith's admission at the hearing, it is clear that she published these statements with reckless disregard as to their truth or falsity.
 {¶ 24} Further, in the letter Smith called for the county prosecutor to overrule the city prosecutor's preliminary finding of justifiable action. She also stated the officers should be prosecuted to the fullest extent of the law, and that life without the possibility of parole would be the appropriate sentence. She stated that to allow the officers to escape without punishment would allow them to get away with "cold-blooded murder." As explained above, Smith provided no supporting explanation as to how she arrived at these conclusions. Smith's only explanation for these conclusions was her vague assertion that they were based on what Willy told her. The record is devoid of what Willy specifically communicated to Smith and how she could have reasonably believed his contentions to be accurate.
 {¶ 25} For the foregoing reasons, we find the trial court did not err when it found Smith wrote her letter with malice, in bad faith, and with recklessness. There exists evidence in the record to support the trial court's conclusion that Smith's intent was to cause harm to the officers' reputations through unsupported and unjustified statements and allegations. Her unfounded statements were not prompted by an honest mistake but by an interested motive to sway the prosecution of the officers regardless of the apparent evidence. She also made fallacious statements, despite the fact that a reasonable person would realize that the statements, without any evidentiary basis, would create an unreasonable risk of harm to the officers. In sum, although Smith may have desired a "fair investigation," there existed myriad ways she could have urged such without leveling the *Page 16 
unsupported assertions she made in the letter. Therefore, we find the record contains competent, credible evidence to support the trial court's decision that Smith was not entitled to immunity, pursuant to R.C. 9.86, and that it did not have jurisdiction over the claims pursuant to R.C. 2743.02(F). Because we find that Smith acted with malice, in bad faith, and in a wanton and reckless manner, we need not address whether Smith was acting within the scope of her employment as a state representative in drafting and sending the letter at issue. Thus, the House's first, second, and third assignments of error are overruled.
 {¶ 26} Accordingly, the House's assignments of error are overruled, and the judgment of the Ohio Court of Claims is affirmed.
Judgment affirmed.
 McGRATH, P.J., concurs. TYACK, J., concurs separately.