[Cite as *Landers v. Ohio Dept. of Rehab. & Corr.*, 2023-Ohio-2857.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Charles A. Landers, Jr., | : | |
| Plaintiff-Appellee/<br>Cross-Appellant, | : | |
| | : | |
| v. | : | No. 22AP-573 |
| | : | (Ct. Cl. No. 2020-00718JD) |
| Ohio Department of Rehabilitation and<br>Correction, | : | (REGULAR CALENDAR) |
| Defendant-Appellant/<br>Cross-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on August 15, 2023

**On brief:** *Rion, Rion & Rion, L.P.A., Inc.,* and *Bradley D. Anderson*, for appellee/cross-appellant. **Argued:** *Bradley D. Anderson.*

**On brief:** *Dave Yost*, Attorney General, *Timothy M. Miller*, and *Daniel J. Benoit*, for appellant/cross-appellee. **Argued:** *Timothy M. Miller.*

APPEAL from the Court of Claims of Ohio

BOGGS, J.

{¶ 1} Plaintiff-appellee/cross-appellant, Charles A. Landers, Jr., and defendant-appellant/cross-appellee, the Ohio Department of Rehabilitation and Correction ("ODRC"), cross-appeal the Court of Claims of Ohio's judgment regarding three former ODRC employees' entitlement to personal immunity with respect to their use of force against Landers, while he was an inmate at the Franklin Medical Center, an institution operated by ODRC.

{¶ 2} Landers sued ODRC in the court of claims for negligence and negligent training and supervision, alleging that he sustained serious injuries from excessive use of

force by former ODRC corrections officers Korday R. Allison, Paris C. Love, and Jovan K. Cason. Landers alleged that the corrections officers were on duty, in uniform, and acting within the scope of their employment at all relevant times.

{¶ 3} ODRC filed a motion, asking the trial court to determine whether Allison, Love, and Cason are entitled to personal immunity under R.C. 9.86 and whether the courts of common pleas have jurisdiction over a civil action against them for the matters alleged in Landers's complaint. The magistrate assigned to the case held an evidentiary hearing and concluded that Love and Cason acted within the scope of their employment and were immune from personal liability, but that Allison acted manifestly outside the scope of his employment and was therefore not entitled to immunity.

{¶ 4} ODRC filed objections to the magistrate's decision regarding Love and Cason, which the trial court sustained in part and overruled in part. The trial court adopted the magistrate's findings of fact, but it held that only Cason was entitled to immunity.

{¶ 5} ODRC filed a timely appeal, and Landers filed a timely cross-appeal. Neither party challenges the trial court's determination that Allison acted manifestly outside the scope of his employment and is therefore not entitled to immunity. As to the other corrections officers, ODRC argues that the trial court erred in determining that Love *is not* entitled to immunity, while Landers argues that the trial court erred by determining that Cason *is* entitled to immunity. For the following reasons, we conclude that none of the three former corrections officers is entitled to personal immunity, and therefore we affirm in part and reverse in part.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 6} The parties do not dispute the magistrate's factual findings, as adopted without objection by the trial court. (Appellant's Brief at 10; Cross-Appellant's Brief at 2, 7; Aug. 16, 2022 Jgmt. Entry at 2.)

### A. The December 29, 2018 incident

{¶ 7} On December 29, 2018, while Landers was an inmate in the custody of ODRC at the Franklin Medical Center, corrections officer Allison confiscated a contraband cigarette from Landers and gave it to another inmate. (May 4, 2022 Mag.'s Decision at 1.) Even though cigarettes are not permitted in the facility, Landers had on prior occasions given Allison a honey bun and a soda in exchange for permission to smoke, but he had not

done so on the day in question. *Id.* The melee from which Landers's excessive force claim arose occurred about five minutes later and is, for the most part, captured on surveillance video. Landers testified that, during the intervening five minutes, he told Allison it was "messed up" that Allison had confiscated Landers's cigarette while allowing other inmates to smoke.

{¶ 8} On the surveillance video, Landers is seen entering the dayroom and walking behind the corrections officers' station. He is holding and looking down at a radio, which he described as like an iPod, and wearing headphones. He does not interact with other inmates or corrections officers in the room. Moments later, Allison enters the dayroom from the same direction as Landers, watches Landers cross behind the officers' station, and then walks around the opposite side of the officers' station and directly approaches Landers. Allison testified that he approached Landers to understand why Landers was so upset after Allison confiscated his cigarette, but Landers claimed that Allison approached and called him a "pussy bitch." (Mar. 7, 2022 Tr. at 61.) Allison and Landers engage in a brief conversation. Landers appears to be upset, and he points his finger at Allison. Meanwhile, Love and Cason exit the officers' station and approach Allison and Landers. Allison turns his back on Landers and acknowledges Love and Cason's presence before turning back toward Landers, who appears to be backed against the wall, with Allison inches from his face, and Love and Cason nearby.

{¶ 9} As Landers takes a step back from Allison, the group moves behind the officers' station and is largely obscured from the surveillance camera's view. From the evidence presented at the immunity hearing, however, the magistrate found that Allison initiated the physical confrontation by striking Landers without provocation and that Love and Cason immediately joined the fracas. The magistrate described the physical skirmish as follows:

> Through the windows of the officer's station, [Landers] is seen falling toward the telephones on the back wall. [Landers] appears to attempt to stabilize himself only to fall again with a corrections officer on top of him. The corrections officers appear to struggle with [Landers] while he was on the ground.
>
> [Landers] subsequently attempts to escape toward the exercise equipment [on the other side of the room] as the group emerges from behind the officer's station and back into view of the camera. Allison follows, eventually tackling [Landers] to the

ground. Cason and Love quickly follow behind. Cason appears to strike [Landers] in the head/neck. Allison * * * picks up a blue chair and hits [Landers] with the chair while [Landers] is on the ground. As [Landers] attempts to get back up off the ground, Love pushes [Landers] in the back down to the ground. Allison then swings his fist at [Landers's] head. Allison and Love jointly push [Landers] back to the ground as [Landers] again attempts to get up. Allison and Cason both appear to strike [Landers] while [Landers] is on the ground. Cason then grabs [Landers] from behind and Allison again strikes [Landers]. Cason picks [Landers] up off the ground, and along with Love, throws [Landers] to the ground. Allison then appears to kick [Landers] in the face. As [Landers] is again attempting to stand up, Allison pushes [Landers's] face down on the edge of the pool table. [Landers] then stands up, and Allison walks away. [Landers] then leaves the dayroom.

(Mag.'s Decision 2-3.) Landers was subsequently handcuffed while sitting on an outdoor bench and was escorted to the captain's office. He completed an "inmate confidential statement" in which he related his version of events. Landers testified that, during the altercation, he did not throw a punch, strike back, or kick the officers.

{¶ 10} Allison, Love, and Cason each completed an incident report and participated in an administrative investigation regarding the use of force. They claimed that Landers lunged, flinched, or jumped toward Allison before any force was used against him. (Mar. 7, 2022 Def.'s Exs. B, C, D.)

{¶ 11} Allison, the only corrections officer who testified at the immunity hearing, stated that he approached Landers in the dayroom to deescalate the situation that began when he confiscated Landers's cigarette. Allison claimed that the situation escalated quickly and that he raised his voice and swore at Landers before Love and Cason approached. Allison admitted that Landers's alleged verbal threats and use of expletives was not enough to warrant either an order to cuff up or the activation of a man down alarm, but he nevertheless claimed that he ordered Landers to cuff up. Allison stated he thought from the way Landers was talking and moving that Landers was going to assault him and that he feared for his safety. Allison stated that Landers made a "sudden movement" that caused him to react with force, but he could not recall what that movement was, and no threatening movement is visible in the surveillance video. (Tr. at 22.)

{¶ 12} ODRC fired Allison, Love, and Cason, all of whom later pled guilty to dereliction of duty related to the use of force against Landers.

{¶ 13} Allison, Love, and Cason had all received training from ODRC regarding the use of force and de-escalation techniques prior to December 29, 2018. Greg Harris, an investigator employed by ODRC testified that ODRC's use of force policy requires corrections officers to use the least amount of force necessary to control a situation, beginning with an order for an inmate to cuff up. If the inmate refuses that order, the corrections officer may use mace. If that does not garner compliance, then the officer may use the least amount of physical force necessary to gain control of the situation. Appropriate use of force, he testified, does not include striking an inmate on the face, stomping on an inmate, or throwing a chair at an inmate—all of which occurred here. He testified that corrections officers are trained to deescalate a situation by removing themselves from the situation if necessary, speaking in a lower-toned voice, and calling for assistance. According to Harris, the corrections officers should have activated their man-down alarms to call for help when they had separation from Landers. Allison did eventually activate his man-down alarm, but only after the use of force incident had concluded, Allison had returned to the officers' station, and Landers had left the dayroom. Neither Love nor Cason activated his man-down alarm.

## B. ODRC's motion to determine the corrections officers' entitlement to personal immunity

{¶ 14} ODRC moved the trial court to determine whether Allison, Love, and Cason are entitled to personal immunity under R.C. 9.86, which states, in part:

> Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

The court of claims has exclusive original jurisdiction to determine whether a government employee is entitled to personal immunity. *McCombs v. Ohio Dept. of Dev. Disabilities*,

10th Dist. No. 21AP-280, 2022-Ohio-1035, ¶ 15, citing R.C. 2743.02 and *Poe v. Univ. of Cincinnati*, 10th Dist. No. 12AP-929, 2013-Ohio-5451, ¶ 7.

{¶ 15} In an action brought in the court of claims, the state will be liable for its employee's action or omission if the state employee would have been personally liable for his or her action or omission but for a determination that the employee is immune under R.C. 9.86. R.C. 2743.02(A)(2); *Johns v. Univ. of Cincinnati Med. Assoc., Inc.*, 101 Ohio St.3d 234, 2004-Ohio-824, ¶ 17. But if the court of claims determines that the state employee is not immune from liability under R.C. 9.86, because the employee acted manifestly outside the scope of his employment or with malicious purpose, in bad faith, or in a wanton or reckless manner, then "the Court of Claims loses jurisdiction over the matter, and the plaintiff may then pursue his or her claim against the employee in a court of common pleas." *Johns* at ¶ 18, citing R.C. 2743.02(A)(1). Here, ODRC maintains that the corrections officers are not entitled to immunity under R.C. 9.86 and that Landers must therefore pursue his claims for relief directly against the corrections officers in the court of common pleas rather than against ODRC in the court of claims.

## C. The magistrate's decision

{¶ 16} Following an evidentiary hearing, the magistrate concluded that Allison was not entitled to immunity under R.C. 9.86, as he "acted with malicious purpose and his actions were manifestly outside the scope of employment." (May 4, 2022 Mag.'s Decision at 10.) The magistrate did not find credible Allison's testimony that Landers made a sudden move that caused Allison to fear for his safety. Based on the surveillance video, the magistrate found that the corrections officers' demeanors were "not consistent with any sort of a situation where they felt threatened," noting that Allison even turned his back on Landers to acknowledge Love and Cason. *Id.* The magistrate found that Landers "posed no threat of physical harm to the staff or himself, he was not ordered to cuff up, he was not destroying property or engaged in a disturbance, and he was not escaping or threatening to escape." *Id.* at 11.

{¶ 17} To the contrary, the magistrate found that Allison "escalated the altercation by confronting [Landers], cornering him, and striking him," that Allison "behaved with malicious purpose by acting with the willful and intentional design to seriously injure [Landers] in this unprovoked attack," and that Allison "failed to exercise any care toward

[Landers] in circumstances where there was a probability that harm [would] result." *Id.* at 10. The magistrate found that none of the corrections officers attempted to handcuff Landers and that none of the corrections officers activated a man-down alarm until after the altercation had concluded and Landers had left the dayroom. The magistrate noted that, even after the physical confrontation began, Landers did not attempt to harm Allison or the other corrections officers but tried only to escape their attacks.

{¶ 18} On the other hand, the magistrate concluded that both Love and Cason acted within the scope of their employment and without malicious purpose, bad faith, or a wanton or reckless manner. He therefore determined that they were entitled to immunity under R.C. 9.86. The magistrate found that Love and Cason "responded in the moment to the confrontation between Allison and [Landers]" and that their actions "furthered [ODRC's] interest" by backing up a fellow corrections officer. *Id.* at 12. In support of that determination, the magistrate noted that neither Love nor Cason initiated the altercation and that their involvement was not part of a planned, coordinated attack.

### D. Trial court's decision on objections

{¶ 19} In its objections, ODRC did not challenge the magistrate's decision with respect to Allison but argued that the magistrate erred by concluding that Love and Cason acted within the scope of their employment and that their use of force against Landers was justified because they were coming to Allison's aid. ODRC argued that the magistrate's findings of fact demonstrated that Love and Cason observed the events immediately preceding Allison's unprovoked assault on Landers and were able to perceive that Landers did not present a threat. Nevertheless, they used unapproved and excessive force against Landers and did not activate their man-down alarms or handcuff him.

{¶ 20} ODRC also argued that the magistrate improperly imposed on ODRC a burden higher than preponderance of the evidence to show that Love and Cason acted manifestly outside the scope of their employment or with a malicious purpose, in bad faith, or in a wanton or reckless manner. Finally, ODRC argued that the magistrate should have given more weight to Love and Cason's criminal convictions arising out of this incident.

{¶ 21} Before addressing ODRC's arguments regarding Love and Cason, the trial court summarily adopted the magistrate's conclusion that Allison was not entitled to immunity under R.C. 9.86. Unlike the magistrate, who considered Love and Cason's

actions together, the trial court addressed them separately and reached different conclusions about Love and Cason's entitlement to immunity. The trial court agreed with the magistrate that corrections officers act within the scope of their employment when they come to the aid of another corrections officer in accordance with Ohio Adm.Code 5120-9-01(C)(2)(c).[1] But it held that Love acted in a wanton or reckless manner when he purportedly came to Allison's aid here. It stated: "Love knew or should have known that, under the circumstances, deescalating the situation would protect himself, his fellow officers, and [Landers]. Instead, Love joined the excessive and unreasonable attack on [Landers]. Indeed, Love knew or should have known that furthering such an attack would create an unnecessary risk of physical harm." (Aug. 16, 2022 Jgmt. Entry at 3.) The court concluded that Love's actions constituted a "failure to exercise care." *Id.* It therefore sustained ODRC's objection with respect to Love, whom it held was not entitled to immunity under R.C. 9.86.

{¶ 22} The trial court did not reach the same conclusion with respect to Cason. The trial court distinguished Cason's conduct from Love's conduct because Cason was a probationary employee. It stated, Cason's "actions cannot be viewed in the same light as" those of his training officer, Love. *Id.* at 3. The trial court stated it could "neither say that Cason prioritizing the duty owed to his fellow officers over the duty he owed to [Landers] was a failure to exercise any care nor that he knew or should have known doing so would

---

[1] Ohio Adm.Code 5120-9-01(C)(2) states:

> There are six general circumstances in which a staff member may use force against an inmate or third person. A staff member may use less-than-deadly force against an inmate in the following circumstances:
>
> (a) Self-defense from physical attack or threat of physical harm.
>
> (b) Defense of another from physical attack or threat of physical attack.
>
> (c) When necessary to control or subdue an inmate who refuses to obey prison rules, regulations or orders.
>
> (d) When necessary to stop an inmate from destroying property or engaging in a riot or other disturbance.
>
> (e) Prevention of an escape or apprehension of an escapee; or
>
> (f) Controlling or subduing an inmate in order to stop or prevent self-inflicted harm.

create an unnecessary risk of harm." *Id.* at 4. It therefore overruled ODRC's objection with respect to Cason, whom it held was entitled to immunity under R.C. 9.86.

{¶ 23} ODRC now appeals the trial court's determination that Cason is entitled to immunity, whereas Landers cross-appeals the trial court's determination that Love is not entitled to immunity. For ease of analysis, we address the cross-appeal regarding Love first.

## II. ANALYSIS

### A. Background and standard of review

{¶ 24} With certain limitations that are inapplicable here, the state has generally waived its sovereign immunity and "consent[ed] to be sued, and have its liability determined in the court of claims * * * in accordance with the same rules of law applicable to suits between private parties." R.C. 2743.02(A)(1). The filing of a civil suit against the state in the court of claims "results in a complete waiver of any cause of action, based on the same act or omission, that the filing party has against any officer or employee" of the state. *Id.* But if the court of claims determines that the state employee whose actions or omissions gave rise to the claim is not immune from personal liability under R.C. 9.86, because the employee acted manifestly outside the scope of his or her employment or acted with malicious purpose, in bad faith, or in a wanton or reckless manner, then the plaintiff's "waiver [of any cause of action against the employee] is void, the Court of Claims loses jurisdiction over the matter, and the plaintiff may then pursue his or her claim against the employee personally in a court of common pleas." *Johns*, 2004-Ohio-824 at ¶ 18, citing R.C. 2743.02(A)(1); *Conley v. Shearer*, 64 Ohio St.3d 284, 287 (1992).

{¶ 25} Whether a state employee is immune from personal liability under R.C. 9.86 is a question of law, but to make that determination, the court must consider specific facts. *Habeeb v. Ohio House of Representatives*, 10th Dist. No. 07AP-895, 2008-Ohio-2651, ¶ 8. For example, "whether an individual acted manifestly outside the scope of employment is a question of fact." *Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208, ¶ 14, citing *Hopper v. Univ. of Cincinnati*, 10th Dist. No. 99AP-787, 2000 Ohio App. LEXIS 3456 (Aug. 3, 2000). Likewise, whether an employee acts with malice, in bad faith, or in a wanton or reckless manner is a question of fact. *See Habeeb* at ¶ 8-9. "In this respect, 'matters involving credibility should be resolved by the trial court, and judgments supported by some competent, credible evidence going to all essential elements of the case

will not be reversed as being against the manifest weight of the evidence.' " *Id.* at ¶ 8, quoting *Morway v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 04AP-1323, 2005-Ohio-5701, ¶ 17, citing *Brooks v. Ohio State Univ.*, 111 Ohio App.3d 342, 350 (10th Dist.1996). We will not reverse the court of claims determinations of those factual questions if some competent, credible evidence supports the court's determination. *See Jodrey v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 12AP-477, 2013-Ohio-289, ¶ 15.

{¶ 26} For purposes of personal immunity under R.C. 9.86, a state employee acts within the scope of his or her employment if the employee's actions are in furtherance of the state's interests. *Theobald* at ¶ 15, citing *Conley* at 287. It is not enough that the employee's act was wrongful. In the context of immunity, the fact that an employee's act was "unnecessary, unjustified, excessive, or improper, does not automatically take the act manifestly outside the scope of employment." *Elliott v. Ohio Dept. of Rehab. & Corr.*, 92 Ohio App.3d 772, 775 (10th Dist.1994), citing *Thomas v. Ohio Dept. of Rehab. & Corr.*, 48 Ohio App.3d 86, 89 (10th Dist.1988), and *Peppers v. Ohio Dept. of Rehab. & Corr.*, 50 Ohio App.3d 87, 90 (10th Dist.1988). "The act must be so divergent that it severs the employer-employee relationship." *Id.* For example, we have held that an employee's intentional act to " ' "vent his own spleen or malevolence against the injured person" ' is a clear divergence from his employment" and severs the employer-employee relationship. *Jodrey* at ¶ 16, quoting *Byrd v. Faber*, 57 Ohio St.3d 56, 59 (1991), quoting *Vrabel v. Acri*, 156 Ohio St. 467, 474 (1952).

{¶ 27} Before turning to the parties' arguments, we pause briefly to review the well-established meanings of other relevant terms in R.C. 9.86. Even if a state employee's act or omission was not manifestly outside the scope of his or her employment, the employee will not be entitled to immunity if the employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner. R.C. 9.86. An employee acts with "malicious purpose" or "malice" when the act involves the "willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified." *Caruso v. State*, 136 Ohio App.3d 616, 620 (10th Dist.2000), citing *Jackson v. Butler Cty. Bd. of Cty. Commrs.*, 76 Ohio App.3d 448, 453-54 (12th Dist.1991), citing *Teramano v. Teramano*, 6 Ohio St.2d 117, 118 (1966). For the meanings of "wanton" and "reckless" in R.C. 9.86, we have previously looked to the definitions the Supreme Court of

Ohio accorded those terms in *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711. *Wee Care Child Ctr., Inc. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 13AP-1004, 2014-Ohio-2913, ¶ 29. "Wanton misconduct" involves "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result." *Anderson* at ¶ 33, citing *Hawkins v. Ivy*, 50 Ohio St.2d 114, 117-18 (1977). And "reckless conduct" is conduct "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id*. at ¶ 34, citing 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965).

## B. Landers's cross-appeal

**{¶ 28}** Landers's cross-appeal challenges the trial court's determination that Love is not entitled to immunity under R.C. 9.86 because Love acted in a wanton or reckless manner.

**{¶ 29}** We begin by addressing Landers's argument that the trial court applied an improper legal standard in concluding that Love acted in a wanton or reckless manner. The trial court held that Love knew or should have known that furthering the "excessive and unreasonable attack" on Landers "would create an unnecessary risk of physical harm" and that Love's actions constituted "a failure to exercise care" with respect to duties he owed to Landers and the other corrections officers. (Aug. 16, 2022 Jgmt. Entry at 3.)

**{¶ 30}** Landers argues that the trial court did not actually find that he acted in a wanton or reckless manner because the trial court's finding of "[a] 'failure to exercise care' is another way of describing simple negligence." (Cross-Appellant's Brief at 14.) Negligence involves a failure to exercise that degree of care which an ordinarily reasonable and prudent person would exercise under the same or similar circumstances. *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989), citing *Gedeon v. E. Ohio Gas Co.*, 128 Ohio St. 335, 338 (1934). Nevertheless, contrary to Landers's suggestion, consideration of a party's exercise of care is not limited to questions of negligence. Indeed, the Supreme Court in *Anderson* expressly recognized that " '[w]illful,' 'wanton,' and 'reckless' describe different and distinct degrees of care," *Anderson* at paragraph one of the syllabus, and it directly incorporated the concept of a "failure to exercise any care" into the definition of "wanton" conduct. *Id*. at ¶ 34.

{¶ 31} The trial court's discussion of Love's conduct does not precisely parallel the Supreme Court's framing of wanton or reckless conduct in *Anderson,* but substance of the court's findings makes clear that it applied the correct standard for analyzing Love's conduct and concluding that it was wanton. The trial court expressly found that Love "fail[ed] to exercise care" toward Landers, to whom he owed a duty, in the face of probable and unnecessary physical harm to Landers, when he joined the "excessive and unreasonable" attack on Landers. (Jgmt. Entry at 3.) The trial court's accurate understanding of the concepts of wanton and reckless conduct is underscored by its subsequent discussion of Cason's conduct. More directly in line with the language the Supreme Court used to describe those concepts in *Anderson*, the trial court stated that it could not say that Cason "fail[ed] to exercise *any* care," despite having actual or constructive knowledge that his actions "would create an unnecessary risk of harm." (Emphasis added.) *Id*. at 4. Reading the trial court's findings regarding Love and Cason's conduct together, we conclude that the trial court applied the correct legal standard in evaluating whether Love acted in a wanton or reckless manner.

{¶ 32} We now turn from Landers's argument that the trial court applied an incorrect legal standard to his argument that, based on the evidence presented, the trial court erred in finding that Love acted in a wanton or reckless manner. Landers specifically argues that the trial court erred by stating that Love "knew or should have known that * * * deescalating the situation would protect himself, his fellow officers, and [Landers]" and "knew or should have known that furthering [the] attack [on Landers] would create an unnecessary risk of physical harm." *Id*. at 3. He claims neither the magistrate's factual findings nor the evidence in the record supports the trial court's statements. We disagree.

{¶ 33} Ohio Adm.Code 5120-9-01(A) recognizes that prison employees may be confronted with situations that necessitate the use of force to control inmates or to respond to inmate resistance. As relevant here, the administrative code authorizes use of less than deadly force against an inmate in "[s]elf-defense from physical attack or threat of physical harm," in "[d]efense of another from physical attack or threat of physical attack," or "[w]hen necessary to control or subdue an inmate who refuses to obey * * * orders." Ohio Adm.Code 5120-9-01(C)(2)(a) through (c). Consistent with Harris's testimony about ODRC's use of force policy, Ohio Adm.Code 5120-9-01(C)(1)(b) states that, when confronted with a

situation that warrants a use of force, the prison employee "should attempt to use only the amount of force reasonably necessary under the circumstances to control the situation and shall attempt to minimize physical injury."

{¶ 34} In *Jodrey*, 2013-Ohio-289, we addressed whether an ODRC corrections officer acted within the scope of his employment when he dumped a partially paralyzed inmate out of a wheelchair and onto the floor of a prison shower room. The evidence in *Jodrey* indicated that the corrections officer had become angry after Jodrey had trouble redressing himself after his shower and then realized, while the corrections officer was accompanying him back from the shower room, that he had forgotten his soap in the shower. When he pushed Jodrey back to get his soap, the corrections officer dumped Jodrey out of his wheelchair and dropped the wheelchair on top of him. As we do here, we acknowledged that use of force is sometimes necessary to control inmates, but we concluded that the circumstances in *Jodrey* did not fall within the parameters established by Ohio Adm.Code 5120-9-01(C). If any of the circumstances listed in the rule had existed, we stated, "the use of force would have furthered [ODRC's] mission to supervise adult offenders in a safe, humane, and secure environment." *Id.* at ¶ 17. But because those circumstances did not exist, we held that the corrections officer's use of force violated ODRC's mission and fell outside the scope of his employment. *See also Nix v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-547, 2014-Ohio-2902, ¶ 28 (corrections officers acted with malicious purpose and manifestly outside the scope of their employment when they maced and assaulted an inmate "without provocation or justification, for the malicious purpose of causing him harm."). The corrections officer in *Jodrey* compromised the inmate's safety and security, we stated, solely because he was angry and frustrated with the inmate. Like *Jodrey*, this case involves corrections officers' use of force where force itself was not permitted by the administrative rule, rather than a use of excessive force when the circumstances warranted the use of lesser force. *Compare Thomas v. Ohio Dept. of Rehab. & Corr.*, 48 Ohio App.3d 86, 87 (10th Dist.1988) (corrections officer's use of force was carried out in the performance of his duties where reasonable, nondeadly force was authorized for inmate's disobedience to a direct order, even though the force used was later determined to be unjustified).

{¶ 35} In the incident report he completed and in his investigatory interview with Harris, Love essentially parroted Allison's purported justifications for the use of force against Landers. He claimed, in direct contradiction of what appears in the surveillance video, that Landers approached Allison yelling. He also stated that Landers disobeyed a direct order to cuff up, that Landers verbally threatened the corrections officers, and that Landers raised his hand to punch Allison. He wrote, "I then stepped in to detain [Landers] before he could cause bodily harm" to Allison. He repeated similar allegations in his investigative interview with Harris, stating that Landers threatened the corrections officers, refused to cuff up, and "jumped at" Allison.

{¶ 36} The magistrate rejected the factual underpinnings of Love's professed belief that physical force was permissible under Ohio Adm.Code 5120-9-01(C)(2) to defend Allison or because Landers refused an order to cuff up. The magistrate found not credible Allison's testimony that he feared for his safety, either due to what Landers was saying or because Landers made a sudden movement, and further rejected Allison's testimony that Landers refused orders to cuff up. Love and Cason observed the interaction between Allison and Landers immediately prior to Allison's initiation of the physical confrontation, yet the magistrate stated that the corrections officers' demeanor "was not consistent with any sort of a situation where they felt threatened by" Landers. (May 4, 2022 Mag.'s Decision at 10.) Ultimately, the magistrate found that Landers "posed no threat of physical harm to the staff or himself [and] was not ordered to cuff up." *Id*. at 11.

{¶ 37} We stress again that all three of the corrections officers involved in this incident had received training from ODRC regarding the department's use-of-force policy and de-escalation techniques. In a demonstration of their understanding of circumstances that may properly warrant the use of force, they each justified the use of force against Landers by reference to circumstances listed in Ohio Adm.Code 5120-9-01(C)(2) in which use of force is permitted—either self-defense or defense of another and Landers's alleged refusal to obey orders to cuff up. The magistrate and the trial court simply did not believe those justifications.

{¶ 38} There can be no doubt that the corrections officers here owed a duty to Landers to keep him safe from harm. *See Jodrey* at ¶ 17 (acknowledging ODRC's "mission to supervise adult offenders in a safe, humane, and secure environment"). Based on Love's

training regarding ODRC's use of force policy and de-escalation techniques, the absence of any credible belief that use of force against Landers was warranted under Ohio Adm.Code 5120-9-01(C)(2), and his observance of the interaction between Allison and Landers that preceded Allison's unprovoked attack on Landers, we conclude that competent, credible evidence supports the trial court's finding that Love knew or should have known that de-escalating the situation—as opposed to engaging in an use of force—would have protected himself, his fellow officers, and Landers.  And based on the corrections officers' failure to try to deescalate the situation or to call for backup, in violation of ODRC policy, coupled with the excessive and violent nature of the force used against Landers, we conclude that competent, credible evidence supports the trial court's determination that Love knew or should have known that joining and furthering the attack on Landers would create an unnecessary risk of serious physical harm.  Accordingly, we find no error in the trial court's finding that Love acted in a wanton manner or its conclusion that Love was not entitled to immunity under R.C. 9.86, and we overrule Landers's assignment of error.

### C.  ODRC's appeal concerning Cason

{¶ 39} Finally, we turn to ODRC's appeal, which challenges the trial court's determination that Cason was entitled to immunity.  In his incident report and investigative interview, Cason offered the same justifications as Allison and Love for the use of force against Landers—that Landers refused to cuff up and that he jumped at Allison.  As we have already stated though, the magistrate and the trial court found those purported justifications unworthy of belief.

{¶ 40} Unlike the magistrate, the trial court addressed Love and Cason's actions separately and held that only Cason was entitled to immunity under R.C. 9.86.  The trial court's sole basis for distinguishing Cason's actions from Love's nearly identical actions was Cason's status as a probationary employee.  It stated:

> While the Court recognizes that Cason too joined in the attack on [Landers], he was a probationary employee being trained by Love.  Simply put, his actions cannot be viewed in the same light as Love['s].  When following the lead of a training officer, Cason's judgment is going to be shaped by that officer's actions. The Court can neither say that Cason prioritizing the duty owed to his fellow officers over the duty he owed to [Landers] was a failure to exercise any care nor that he knew or should have known doing so would create an unnecessary risk of harm.

> Moreover, as the magistrate correctly determined, there is no evidence that Cason's actions were motivated by malice or bad faith.

(Jgmt. Entry at 3-4.)

{¶ 41} The trial court's statement that Cason was "prioritizing the duty [he] owed to his fellow officers over the duty he owed to" Landers is not supported by competent, credible evidence. While there is no debate that a corrections officer is entitled to defend another corrections officer from a physical attack or a threat of physical harm, *see* Ohio Adm.Code 5120-9-01(C)(2)(b), here there are no facts giving rise to a duty for Cason to protect Allison, whom he watched strike Landers without provocation and without a factual basis justifying a use of force. Considering there was no basis for Allison to use force against Landers to protect himself, there was no basis for Love or Cason to use force against Landers to protect Allison. A person's right to defend another is no greater than the right to defend himself. *State v. Wenger*, 58 Ohio St.2d 336, 340 (1979).

{¶ 42} Additionally, competent, credible evidence does not support the trial court's finding that Cason's probationary status somehow removed his actions from the realm of wanton or reckless misconduct. A corrections officer is considered a "probationary" employee for his first year of employment. Harris testified that he learned of Cason's probationary status during his investigation of this incident, and he agreed with Landers's attorney that Cason was "following Officer Love around to try to learn the functions of a corrections officer." (June 16, 2022 Tr. at 114.) Despite Cason's probationary employment status, though, Harris went on to testify that Cason had already undergone the same training as the non-probationary corrections officers before he would have been permitted to work in the prison facility, and Cason admitted that he had been trained in use of force and de-escalation tactics. Cason was, in fact, the only one of the three corrections officers who could identify for Harris the elements that must be present to justify the use of force.

{¶ 43} The record contains no evidence from which the trial court could reasonably differentiate a probationary employee from a non-probationary employee vis-à-vis the employee's job duties. Harris stated that he would expect even a probationary corrections officer to "know right from wrong" (Tr. at 116) and to not side with another corrections officer who has "crosse[d] the line" (Tr. at 115). It would be absurd to suggest that a corrections officer's conduct is shielded from being found wanton or reckless for an entire

year, simply because the officer's employment status is designated probationary. Moreover, even if we were, like the trial court, to assume that a probationary employee's judgment may be shaped by his training officer's actions, there is no evidence to suggest that Cason joined the attack on Landers in response to or in emulation of Love's conduct. Any suggestion to that effect would be pure speculation. In fact, Cason himself did not claim he was following Love's lead with respect to the use of force; instead, he offered the same unfounded justifications as Allison and Love. Accordingly, we conclude that the record contains no competent, credible evidence on which the trial court could distinguish Cason's conduct from Love's conduct, or conclude that Cason, unlike Allison and Love, was entitled to immunity under R.C. 9.86. As such we sustain ODRC's assignment of error.

## III. CONCLUSION

{¶ 44} For these reasons, Lander's assignment of error is overruled, ODRC's assignment of error is sustained, and we affirm the judgment of the court of claims that Love is not entitled to immunity under R.C. 9.86, but we reverse the judgment of the court of claims that Cason is entitled to immunity. None of the three corrections officers involved in the attack on Landers is entitled to immunity. We remand this matter to the court of claims to enter judgment consistent with this decision.

*Judgment affirmed in part*
*and reversed in part.*

LUPER SCHUSTER and EDELSTEIN, JJ., concur.

_____